[No. 38822. Department One. January 25, 1968.]

THE STATE OF WASHINGTON, *Respondent,* v. CYRILL
ATHANASIOS KOLOCOTRONIS, *Appellant.**

*Reported in 436 P.2d 774.

*Johnston & Woody* and *Frank J. Woody,* for appellant (appointed counsel for appeal).

*Cyrill Athanasios Kolocotronis,* pro se.

*Robert E. Schillberg, Allen J. Hendricks,* and *David G. Metcalf,* for respondent.

WARD, J.†—The defendant, Cyrill Athanasios Kolocotronis, was charged with the crimes of first degree burglary, second degree assault, and attempted rape, all charges arising out of the same incident. On defendant's first appearance in superior court on September 29, 1965, the court noted that the defendant did not seem to comprehend what was happening and was informed that defendant had a history of mental illness. On the following day, the court ordered a sanity commission of three psychiatrists to determine and report to the court: (1) Whether the defendant was presently sane? (2) Whether the defendant was capable of appreciating his peril? (3) Whether the defendant was capable of rationally assisting in his own defense. Based on an examination of the defendant in early

---

†Judge Ward is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

October 1965, the sanity commission answered all three questions in the negative. One of the psychiatrists testified that on that examination the defendant was psychotic and suffered delusions:

[H]e thought I was his uncle. He also revealed certain hallucinatory manifestations—claimed that he saw girls in his cell; he also told me that he had seen his father [who had been deceased since 1949] in the jail, and that his father could change size and get through the bars.

On receipt of the commission's report, the trial court stayed proceedings and committed him to Northern State Hospital for observation and treatment.

Dr. Larson, his attending psychiatrist at the state institution, diagnosed his condition as acute undifferentiated schizophrenia. He testified that the defendant exhibited unusual sexual manifestations, resulting from his delusions, and was the most difficult patient, on admission, which the hospital had had in the preceding 11 months.

Defendant's medical history showed 12 prior admissions to mental hospitals over the period of 8 years prior to trial. The recurrent commitments followed a pattern of unacceptable social conduct, precipitated by the buildup of mental crises, after the defendant failed to continue his prescribed medication. His last prior commitment was to the Eastern State Hospital, from which he took unauthorized leave. He discontinued use of prescribed medicine for a few weeks and then committed the acts which resulted in his arrest on the charges of burglary, assault and attempted rape.

Under treatment at the Northern State Hospital with enforced medication, the defendant's mental condition improved rapidly and he was returned to the Snohomish County jail and re-examined on January 21, 1966, by two members of the sanity commission which had examined him previously. They found and reported to the court that defendant was then sane, appreciated his peril in connection with the pending criminal charges and was capable of rationally assisting in his defense.

A second pretrial proceeding was had on January 24, 1966, at which the trial court adopted as its conclusion the report of the sanity commission that defendant was then able to stand trial. Defendant was then arraigned and pleaded not guilty. He was represented at this hearing by counsel appointed by the court on account of his inability to employ counsel. In addition to defendant's plea of not guilty, his counsel, over defendant's objection, interposed a special plea that defendant was not guilty by reason of his insanity at the time the acts were committed, but that he was, at the time of trial, sane and mentally responsible. RCW 10.76.020 permits the interposition of such a plea by "the defendant, his counsel or other person authorized by law to appear and act for him, . . . ."

The trial commenced on March 7, 1966. At that time, his mental condition had improved to the point where the defendant felt competent to handle his own defense and insisted on using his counsel only in an advisory capacity. He also demanded that the special plea of insanity be withdrawn. The court refused to allow withdrawal of the plea of insanity and commenced trial after counsel had emphasized his intention not "to back off from my duties in this case whatsoever; . . . ."

At the trial, the defendant did participate in the handling of his own defense. The defendant was permitted to question jurors on their voir dire examination, make an opening statement to the jury, cross-examine the state's witnesses, and against his counsel's advice, testify in his own behalf. He made numerous motions and objections to evidence offered, some of which had merit and were sustained by the court.

However, the court also permitted defendant's court-appointed counsel to participate in the examination and cross-examination of witnesses, make a closing argument to the jury, and generally give aid where legal skill was needed. Over defendant's objection, the court permitted defense counsel to call three psychiatrists who had examined the defendant at the court's direction, and present evidence in support of the special plea of insanity. The evidence was

conclusive that the defendant was insane at the time of commission of the acts.

Court-appointed counsel rendered necessary services, during the trial, in areas overlooked by defendant acting pro se. He attempted to convince the jury that defendant could safely be treated on an out-patient basis, and that he would be a safe person to be at large. Counsel moved for dismissal of all charges and was successful in obtaining a dismissal of the burglary charge. He made a vigorous argument to the jury that the state had failed to prove the charges of assault and attempted rape beyond a reasonable doubt.

The jury returned a general verdict of not guilty, and special verdicts that: (1) Defendant did commit the crimes charged. (2) The defendant was acquitted because of insanity at the time the crimes were committed. (3) Defendant was not insane at the time of trial. (4) There was such likelihood of a relapse or recurrence of the insane condition that the defendant was not a safe person to be at large.

There was sufficient evidence to sustain special verdict No. (4), including: (1) The bizarre nature of his assault upon the victim. (2) Defendant's threats to kill her when she screamed. (3) His threats to kill the three persons who came to her assistance. (4) The unusual manifestation of sex abnormalities when in a state of tension. (5) Testimony that he had not in the past, and probably would not continue his medication when released from a mental institution. (6) Dr. Larson's testimony that 3 weeks without treatment would make him potentially dangerous. (7) Testimony that he needed continuation of medication for a period of from 6 to 10 years in the future. (8) The testimony of all three psychiatrists that he would be dangerous without further treatment.

Briefs on appeal have been submitted both by the defendant, pro se, and by counsel appointed by the court to assist him on his appeal. We will consider first the assignments of error set out in counsel's brief.

The first four assignments focus on defendant's claim that he was denied his constitutional right to act as his own

counsel. The defendant claims that his constitutional rights were ignored when the trial court permitted court-appointed counsel to interpose the defense of insanity over defendant's objection, when the court denied defendant's demand that such defense be stricken, and when the court permitted court-appointed counsel, over defendant's objection, to call witnesses to support such defense. Error is also assigned to the submission of such special issues to the jury, over defendant's objection and entry of judgment upon the jury's verdicts on the special issue of insanity.

Before considering the constitutional questions presented by the first four assignments, we dispose of a factual issue set out in the brief of counsel on appeal. He was not the same attorney who represented the defendant in the trial court. He claims that the trial counsel was never appointed to represent the defendant in the trial court. The record does not support this contention. On the defendant's first appearance in superior court on September 29, 1965, the court stated: "I will appoint Mr. Ingalls to represent Mr. Kolocotronis." Pursuant to that appointment, this counsel represented the defendant at all preliminary proceedings and on the trial of the case. Defendant made no objections to the services rendered by counsel except as they related to the issue of insanity.

The defendant was effectively denied the right to act as his own counsel, contrary to his repeated demands, on all matters relating to the issue of his insanity. His right to act as his own counsel was denied him by the court in permitting his court-appointed counsel, over defendant's objections, to enter the special plea of not guilty by reason of insanity, to call witnesses and to elicit testimony to support the special plea, and by submitting to the jury the issues dealing with insanity, over defendant's objection.

The right which the defendant asserts is set out in Const. art. 1, § 22 (amendment 10): "In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, . . . ." The language used in the constitutional provision is plain, direct, unqualified, unambiguous, and unequivocal. But, it is no more so than lan-

98

guage contained in the Bill of Rights of the United States Constitution.

■ In speaking of the First Amendment, as it relates to the right of free speech, the United States Supreme Court said in *United Pub. Workers of America v. Mitchell*, 330 U. S. 75, 95, 91 L. Ed. 754, 67 Sup. Ct. 556 (1947): "Of course, it is accepted constitutional doctrine that these fundamental human rights are not absolutes." See also *Kovacs v. Cooper*, 336 U. S. 77, 93 L. Ed. 513, 69 Sup. Ct. 448, 10 A.L.R.2d 608 (1949), which repeats the same qualification and quotes Justice Holmes' well known homily that the constitutional right of free speech can not justify a malicious cry of fire causing panic in a crowded theatre. *Schenck v. United States*, 249 U. S. 47, 63 L. Ed. 470, 39 Sup. Ct. 247 (1919).

As long ago as 89 years, the United States Supreme Court in *Reynolds v. United States*, 98 U. S. 145, 25 L. Ed. 244 (1878), in considering the plain, unqualified language of the First Amendment: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." upheld an act of Congress making polygamy in the territories of the United States a felony, even in the face of a showing that "the failing or refusing to practice polygamy by such male members of said church, when circumstances would admit, would be punished, and that the penalty for such failure and refusal would be damnation in the life to come."

So also, the right of an accused, granted by the constitution, to act as his own counsel may not properly be construed as an absolute right in all cases. To do so would permit other vital constitutional liberties to be overridden by a pronouncement of doctrinaire dogma. The proper rule of construction is stated in 16 Am. Jur. 2d *Constitutional Law* § 328, 634 (1964): "Constitutional rights are not absolute rights existing independently of other privileges protected by the same organic instrument."

■ The rule is more particularly stated as it relates to the issue now presented for determination in 77 A.L.R.2d 1233, 1235 (1961), as follows: "It is generally recognized

that in the absence of unusual circumstances a defendant in a criminal case *who is sui juris and mentally competent* has the right to conduct his defense in person, without the assistance of counsel." (Footnote omitted.) (Italics ours.)

Even though a defendant demands his constitutional right to act as his own counsel, if the court determines that he does not have the requisite mental competency to intelligently waive the services of counsel nor adequate mental competency to act as his own counsel, then his right to a fair trial and his constitutional right to due process of law, is disregarded if the court permits him to so act in a criminal case. Const. art. 1, § 3 provides: "No person shall be deprived of life, liberty, or property, without due process of law." An accused's rights under the fifth and fourteenth amendments to the United States Constitution are the same.

The United States Supreme Court has stated that an accused's right to the assistance of counsel under the Sixth Amendment is denied him if he is tried and convicted of a crime, without having competently and intelligently waived the services of counsel.

In *Johnson v. Zerbst*, 304 U. S. 458, 468, 82 L. Ed. 1461, 58 Sup. Ct. 1019, 146 A.L.R. 357 (1938), the court said: "If the accused, however, is not represented by counsel and has not competently and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty."

The United States Supeme Court has expressed the duty of the trial court in such a situation in *Westbrook v. Arizona*, 384 U.S. 150-51, 16 L. Ed. 2d 429, 86 Sup. Ct. 1320 (1966) as follows:

The motion for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense. "The constitutional right of an accused to be represented by

counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." *Johnson v. Zerbst,* 304 U.S. 458, 465; [82 L. Ed. 1461, 1467, 58 Sup. Ct. 1019, 146 A.L.R. 357] *Carnley v. Cochran,* 369 U.S. 506 [8 L. Ed. 2d 70, 82 Sup. Ct. 884].

From an independent examination of the record, we conclude that the question whether this "protecting duty" was fulfilled should be re-examined in light of our decision this Term in *Pate v. Robinson,* 383 U.S. 375, [15 L. Ed. 2d 815, 86 Sup. Ct. 836]. Accordingly, the judgment of the Supreme Court of Arizona is vacated and the case is remanded to that court for proceedings not inconsistent herewith.

*It is so ordered.*

*Westbrook v. Arizona, supra,* was brought to the United States Supreme Court on petition for a writ of certiorari from *State v. Westbrook,* 99 Ariz. 30, 406 P.2d 388 (1965). In the state court the defendant was charged with murder and insisted on his constitutional right to act as his own counsel during the trial. He was granted that right after the court heard the testimony of two psychiatrists, who were members of the court-appointed sanity commission, to the effect that defendant was able to understand the proceedings against him and able to aid counsel in his defense. His first assignment of error, on appeal, was that the court erred in determining that he was able to conduct his own defense. At the pre-trial hearing the court had determined that the defendant understood the nature of the charges against him and could assist in his own defense and " 'that he was neither mentally defective nor insane and could proceed to trial.' " *State v. Westbrook, supra,* at 34. On appeal to the state supreme court, defendant contended that there is a distinction between being able to assist in his defense and in being able to conduct his own defense. The United States Supreme Court agreed with this contention.

*Westbrook v. Arizona, supra,* is dispositive of the defendant's contention in the instant case that when the trial

court at the preliminary hearing adopted the psychiatrists' conclusion that Mr. Kolocotronis had sufficient mental competency to stand trial, it was also determinative of Mr. Kolocotronis' ability and competency to conduct his own defense.

■ The case holds unequivocally, that an adjudication by the trial court that an accused is capable of going to trial and aiding his counsel, is not a determination of his competency to act as his own counsel.

■ When the accused demands his constitutional right to act as his own counsel, the trial court is faced with the necessity of making a factual determination of the competency of the accused to: (1) intelligently waive the services of counsel, and (2) act as his own counsel.

■ In *Johnson v. Zerbst, supra,* the court said at 464: "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

The language used in *McCann v. Maxwell,* 174 Ohio St. 282, 285, 189 N.E.2d 143 (1963), is particularly pertinent to the problem which faced the trial court in the present case:

> However, there must necessarily repose in the trial court a certain discretion in these matters. If the mental condition of an accused is such, either by mental derangement or by lack of knowledge, that the court feels that the accused would be incompetent to conduct his own defense and thus be deprived of a fair trial, or the gravity of the offense is such that it carries a severe penalty, the court may, in the interest of justice or if it feels it necessary in order to protect the judicial process from deterioration, appoint counsel to represent the accused. *People v. Burson,* 11 Ill. (2d), 360; and *People v. Mitman,* 7 Cal. Rep., 712.
>
> Therefore, if a trial court determines that an accused is incompetent to defend himself, the court even over his protests may appoint counsel to represent him.

See also, *State v. White,* 86 N.J. Super. 410, 207 A.2d 178 (1965).

■ Past mental illness is not determinative of an accused's present mental competency to conduct his own defense. However, a past history of serious mental illness is a factor which must be given considerable weight in determining the accused's present condition. In *Westbrook v. Arizona, supra,* the Supreme Court directed the trial court to determine Westbrook's ability to act as his own counsel in the light of *Pate v. Robinson,* 383 U.S. 375, 15 L. Ed. 2d 815, 86 Sup. Ct. 836 (1966). This was, in effect, a direction to the court to examine Westbrook's mental competency to conduct his own defense in the light of any evidence or record of mental illness.

In the present case, the defendant came to trial with a past history of schizophrenia, and with at least 12 prior hospitalizations for his mental illness.

The defendant was in a state of remission at the time of trial and was able to understand the nature of the proceedings against him, and to appreciate his peril, and was able to be of assistance to his counsel. That condition is determinative only of his ability to stand trial, not of his ability to act as his own counsel, and to exercise the skill and judgment necessary to secure to himself a fair trial.

An examination of the entire record supports the trial court's determination that the defendant lacked mental competency to act as his own counsel without the assistance given by Mr. Ingalls, and that he lacked mental competency to determine the advisability of submitting the defense of insanity, and the ability necessary to properly support such defense. The trial court exercised sound discretion under the facts and circumstances of this case.

By defendant's assignments of error 4 and 5, an attack is made upon the statute under which defendant was determined by the jury to be criminally insane. Defendant asserts that Laws of 1907, ch. 30, § 3, p. 33, now codified as RCW 10.76.030,[1] was repealed by Laws of 1909, ch. 249 and has never been re-enacted.

---

[1]Sec. 3. "If the plea of insanity or mental irresponsibility be interposed, and evidence upon that issue be given, the court shall instruct

Chapter 30 of the Laws of 1907, was an act of 10 sections, entitled "An Act relating to the criminal insane, their trial, commitment and custody." It has been carried forward in all codes since enactment with amendments only to sections 6, 8 and 10. The Laws of 1909, ch. 249, p. 890, contained a comprehensive criminal code of 444 sections taken largely from the New York and Minnesota criminal statutes. Section 52 of the 1909 act was the repealing section. Chapter 30 of the Laws of 1907 was not specifically repealed, but section 52 of the 1909 act provided that "all acts and parts of acts in conflict with the provisions hereof, are hereby repealed."

The Laws of 1909, ch. 249, contained two sections, 7 and 31, which were in direct conflict with the provisions of the Laws of 1907, ch. 30. By section 7, the legislature purported to abolish insanity as a defense to a criminal charge, and by section 31, the legislature purported to set up a procedure by which the judge, after the defendant was convicted of crime, could without further jury proceedings, determine the insanity of the defendant and could commit him to a mental hospital or the insane ward of the penitentiary.

If sections 7 and 31 were valid legislative enactments, they would without question have resulted in the repeal of the Laws of 1907, ch. 30, § 3. This court, however, in *State v. Strasburg*, 60 Wash. 106, 110 Pac. 1020 (1910), determined that the procedure set out in the 1909 act for determining the rights of a criminally insane person, charged with crime was violative of article 1, section 3 of the Wash-

---

the jury when giving the charge, that in case a verdict of acquittal of the crime charged be returned, they shall also return special verdicts finding (1) whether the defendant committed the crime and if so, (2) whether they acquit him because of his insanity or mental irresponsibility at the time of its commission, (3) whether the insanity or mental irresponsibility continues and exists at the time of the trial, and (4) whether, if such condition of insanity or mental irresponsibility does not exist at the time of the trial, there is such likelihood of a relapse or recurrence of the insane or mental irresponsible condition, that the defendant is not a safe person to be at large. Forms for the return of the special verdicts shall be submitted to the jury with the forms for the general verdicts."

ington State Constitution: "No person shall be deprived of life, liberty, or property, without due process of law" and article 1, section 21: "The right of trial by jury shall remain inviolate, . . . ."

Three of the judges held specifically that section 7 was unconstitutional, but omitted consideration of the constitutionality of section 31. Five concurring judges held specifically that section 31 was also unconstitutional.

 The effect of such declaration of unconstitutionality of these two sections of the 1909 act, upon the former act, has never been considered by this court. Apparently the legislature, the courts and the codifiers have all assumed without discussion, that no repeal of the 1907 act became effective by reason of the declaration of unconstitutionality of the two sections of the 1909 act. We agree with such conclusion.

It has been the established decisional law in this state since 1890, that if a statute be repealed by a subsequent legislative act, and the subsequent legislative act be declared unconstitutional by this court, such declaration of unconstitutionality renders the repealing act invalid and the former act is deemed unaffected by the void repealing enactment, leaving the former statute in full force and effect. *In re Rafferty,* 1 Wash. 382, 25 Pac. 465 (1890). Under this rule, the declaration of unconstitutionality of sections 7 and 31 of the Laws of 1909, expressed in our decision in *State v. Strasburg, supra,* left all of the provisions of chapter 30, Laws of 1907, wholly unaffected by the 1909 act, and in full force and effect. See also, *State ex rel. Kirschner v. Urquhart,* 50 Wn.2d 131, 310 P.2d 261 (1957); *Texas Co. v. Cohn,* 8 Wn.2d 360, 112 P.2d 522 (1941); *North Bend Stage Line v. Department Pub. Works,* 170 Wash. 217, 16 P.2d 206 (1932); 82 C.J.S. *Statutes* § 281 (1953); 16 Am. Jur. 2d *Constitutional Law* § 177 (1964); *Mazurek v. Farmers' Mut. Fire Ins. Co.,* 320 Pa. 33, 181 Atl. 570, 102 A.L.R. 798 (1935); *Faubus v. Kinney,* 239 Ark. 443, 389 S.W.2d 887 (1965); *State ex rel. Heck's Discount Centers v. Winters,* 147 W.Va. 861, 132 S.E.2d 374 (1963).

The rule applies whether the repeal is by specific provision of the subsequent act, or whether it is the result of general terms only. 50 Am. Jur. *Statutes* § 521 (1944) at 530, states: "In the case of an invalid statute containing a general repeal of all prior inconsistent acts or parts thereof, . . . the repeal is even less readily supported." (Footnote omitted.)

The defendant contends that the rule above stated does not apply to criminal statutes. He overlooks the fact that *In re Rafferty, supra,* was concerned with an attempted repeal and reenactment of a statute dealing with the crime of rape. The defendant relies on *Ingersoll v. State,* 11 Ind. 464 (1859) and *Lutwin v. State,* 97 N.J.L. 67, 117 Atl. 164 (1922). These cases state an exception to the general rule, and this exception has been applied in a few states only. The cited cases go no further than to hold, in effect, that public policy can not support a conviction for crime committed during the period of time which elapses between the attempted repeal of the criminal statute under which an accused was charged and the pronouncement of unconstitutionality or invalidity of the repealing statute by court decision. In the cited cases, the courts reasoned that to uphold such conviction would be to unfairly catch the victim in "a concealed trap." The limited application of the cases relied on is discussed in 16 C.J. *Criminal Law* § 38 (1918) and 22 C.J.S. *Criminal Law* § 27(6) (1961). The defendant, in the instant case, was not caught in any such "concealed trap." The criminal insane statute has been set out in all published codes of this state since 1910 and 57 years have elapsed since *State v. Strasburg, supra,* was decided and published.

Defendant has also filed pro se briefs in which he makes 14 assignments of error. Several cover the same areas as the assignments of error set out in the brief of appellate counsel. They have already been discussed. Several others merit no discussion.

Defendant urges that submission of the plea of insanity, made it impossible for him to gain his release on a verdict of not guilty, because the jury would tend to compromise

and find him not guilty by reason of insanity. He asserts that if the jury were faced only with the alternatives of guilty or not guilty, they would have found him not guilty and he would have been free. This argument is no more than speculation as to what the jury would have done. If speculation were permissible, the record would support exactly the opposite conclusion.

Defendant claims that there were many instances of perjury in the testimony of the state's witnesses. The record lends no support to these charges.

Defendant asserts that the intent to commit rape was never proven. There was sufficient evidence from which the jury could determine that the defendant intended to commit the crime. The court did not err in submitting his guilt or innocence of that charge to the jury for determination. He was found not guilty.

Defendant contends that the jury's answer to special verdict number (3) finding that the insanity or mentally irresponsible condition did not continue at the time of the trial was inconsistent with special verdict number (4) in which the jury found that there was such a likelihood of a relapse or recurrence of the insane or mentally irresponsible condition that the defendant was not a safe person to be at large. The argument continues that special verdict number (4) allows the jury to speculate as to the defendant's future mental condition upon which a commitment in a mental institution can be based.

■ We do not find the two special verdicts inconsistent. Special verdict number (3) goes to the question of whether the insanity or mental irresponsibility found under special verdict number (2) continued at the time of trial. In this state, the test of insanity or mental irresponsibility sufficient to establish a defense of not guilty by reason of insanity is the M'Naghten test. The determination of special verdict number (2) is therefore, dependent upon whether the defendant's mental condition brings him within the M'Naghten test. Special verdict number (3) merely asked if "the insanity or mental irresponsible condition continue[d] to exist at the time of the trial?" Special verdict

number (4) is addressed to a different question and M'Naghten has no bearing on that question. The question is simply whether the defendant's mental condition at the time of trial was such that he would be unsafe to be at large. There is, therefore, nothing inconsistent between special verdicts (3) and (4). Neither does special verdict (4) call for a future prognosis based on speculation. It provides for a jury determination of a presently existing condition. All three of the expert witnesses testified that the defendant needed further treatment. There was expert testimony that without further treatment the defendant was dangerous. The jury found the defendant's present mental condition such that he would be dangerous if released.

Note the similarity of the determination which must be made by the court, under RCW 71.02.090, in order to make an involuntary commitment under the civil statute.

The defendant's final assignment of error is a sweeping charge of conspiracy between his court-appointed counsel and the prosecuting attorney to procure, by the use of perjured testimony, the verdict that he was not a safe person to be at large. The record not only fails to support the claim, but we make the same appraisal of the services of his counsel which was made in *State v. Shelton,* 71 Wn.2d 838, 840, 431 P.2d 201 (1967): "We find that appellant was well represented by counsel who did everything which the best traditions of his profession demanded. Appellant's right to a fair trial was protected in every essential particular."

The attack which the defendant makes upon his court-appointed counsel fits into the pattern occurring with increasing frequency, which we have lately noted with concern. *State v. Keller,* 65 Wn.2d 907, 400 P.2d 370 (1965); *State v. Roberts,* 69 Wn.2d 921, 421 P.2d 1014 (1966); *State v. Lytle,* 71 Wn.2d 83, 426 P.2d 502 (1967); *State v. Piche,* 71 Wn.2d 583, 430 P.2d 522 (1967); *State v. Shelton, supra.*

We find no error in the record. The judgment is affirmed.

FINLEY, C. J., HILL, WEAVER, and ROSELLINI, JJ., concur.