IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36552-2-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 36553-1-III) |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| LANCE THEOPOLIS SMITH, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Lance Smith appeals after a jury found him guilty of

two counts of felony violation of a no-contact order. Smith contends the trial court

committed constitutional error when it revoked his self-represented status, appointed

counsel, and later refused to allow him to represent himself. Because Smith lacked the

mental capacity to represent himself, we affirm.

FACTS

Lance Smith was a server at a restaurant in Richland. Jennifer Bonneru also

worked there. Smith and Bonneru became friends, but were never romantically involved.

They worked together for about six months. During this time, Smith sustained a head

injury from a snowboarding accident.

When Smith returned to work, Bonneru noticed a change in his behavior.  Smith acted strange, said weird things, began peeling decals from the restaurant's windows, and tried to plant trees in concrete outside the restaurant.  The restaurant asked Smith not to come back to work.

After Smith left the restaurant, he began contacting Bonneru.  He sent Bonneru lengthy messages that did not make sense.  She asked him to stop.  She blocked him on social media and changed her telephone number.  Smith sent messages to her through Facebook, sent letters to her place of employment, contacted her sister and mother, and threatened her ex-boyfriends.  At one point, Bonneru's cell phone was rendered temporarily inoperable because Smith had sent over 200 texts within a short period of time.

Bonneru contacted police and obtained a no-contact order.  Additional orders were placed after misdemeanor violations by Smith.

In the fall of 2017, Smith sent Bonneru a message through Facebook in violation of an existing no-contact order.  In January 2018, Smith saw Bonneru through the front window of a bar and waved at her.  Bonneru's friend asked Smith to leave and called the police.

*Procedural History*

The State charged Smith with two felony violations of a no-contact order under separate cause numbers for the 2017 and 2018 incidents. The trial court consolidated Smith's two cases. At his initial appearance, the court appointed public counsel for Smith.

At Smith's omnibus hearing, he requested to represent himself. Smith told the trial court he self-studied the law, was relatively familiar with the rules of evidence, wanted to represent himself because he was innocent, and believed he would have a bigger effect representing himself and proving his innocence. The court denied Smith's oral motion but allowed Smith to make a written motion.

Smith filed a written motion to represent himself and the trial court granted it. Smith argued for release on his own recognizance. The court denied Smith's request, but lowered his bail amount. Smith continued to dispute the court's decision.

Throughout pretrial proceedings, Smith continued to argue with, berate, and ask unusual questions to the trial court. *See* Report of Proceedings (RP) (Jan. 25, 2018) at 3-5; RP (Feb. 28, 2018) at 42-45, 47-51, 53; RP (Mar. 7, 2018) at 9-13, 39, 41-46, 67, 71, 74-77, 80, 91-93, 98-104, 106-07, 113-14, 121-24, 161-64, 166-68; RP (Mar. 12, 2018) at 10; RP (Mar. 14, 2018) at 31-39, 42-43, 46; RP (Apr. 11, 2018) at 54; RP (July 25, 2018)

at 6-10; RP (Nov. 5, 2018) at 17-18, 20-25, 36-41, 44-45; RP (Dec. 19, 2018) at 48-52.

The court ordered a competency evaluation. Smith's evaluator found Smith competent to stand trial.

Smith's case proceeded to trial. During voir dire, Smith repeatedly asked the jurors which of them did not want to be there. A few minutes in, four jurors said they could not be fair because Smith made a bad decision to represent himself, and he made a negative impact on them. The trial court excused those jurors.

Smith then began making an opening argument to the venire jury; the court re-directed him to ask the jurors questions. Smith then asked a juror who was the most famous attorney he knew. At that point, a different juror addressed the court and said, "I am concerned whether the defendant is of a sound mind the way this is proceeding and I just wanted to bring that to your attention." RP (Mar. 12, 2018) at 69. Smith responded to the juror by saying he comes off as a genius to some people or really irritating and completely mental to others. Smith and the juror then began to argue.

Smith asked a different juror if he was excited for St. Patrick's Day. Smith asked another, "[D]o you like the way our government is being ran right now?" RP (Mar. 12, 2018) at 71. Smith asked another, "[D]o you think it's cool or not cool that the Bible is no longer in our courtroom?" RP (Mar. 12, 2018) at 72. Smith stated he had been locked

4

up for two months and asked another juror if it was springtime. He asked two more jurors if they appreciated the way the government is being run. A juror then addressed Smith directly: "Mr. Smith, I am concerned about your ability to represent yourself. You are off topic. You're—you don't seem to be aware of what time of the year it is, and I don't think I can be fair because I don't think you have the capability to represent yourself." RP (Mar. 12, 2018) at 73.

At that point, the trial court excused the venire jury and spoke to the parties about the jurors' concerns. Those concerns, coupled with the fact that Smith asked repetitive questions, referred to being locked up, and said he hoped he would be out in the new year, led the court to declare a mistrial. The court set a hearing date to determine whether Smith could continue to represent himself.

At that hearing, the trial court ultimately determined that Smith could not continue to represent himself and receive a fair trial. The court explained to Smith:

> You have a consistent pattern in hearings and sessions in court of being unable to, either through the passage of time or through results that you disagree with, that you're simply unable to keep from acting out. And that makes it impossible for you to discharge the role of representing yourself.
> As I indicated to you, the problem with that is that your failure to comply would have the disastrous result that not only would you be unable to represent yourself, but, if I had to remove you from the courtroom for your behavior, you would then be left in a position without anyone present to be able to vindicate your interests.

5

> Here, using the analogy of <u>State v. Thompson</u>, [169 Wn. App. 436, 290 P.3d 996 (2012)] which deals with it in the context of appointing successor counsel, I find that it's appropriate to deny you pro se status because you're not merely disruptive but you're sufficiently disruptive that it means that we can't pick a jury.
> *The Court in* [*State v.*] <u>Kolocotronis</u>[, 73 Wn.2d 92, 436 P.2d 774 (1968)] *indicates that mental health is an issue that the Court can consider. Mental health issues that don't rise to the level of incompetency are still properly considered by the Court.*
> *. . . But your behavior, during our attempt to pick a jury, has shown that those things about you, which I've described, mean that there's no reasonable likelihood that you can effectively represent yourself. . . .*

RP (Mar. 14, 2018) at 40-41 (emphasis added). Smith then began to argue, interrupt, and speak out, and the court removed him from the courtroom.

At the next hearing, Smith spoke out of turn and asked the trial court if it was familiar with mutual combat and said, "[Y]ou may be subpoenaed to mutual combat with me by the State of Washington." RP (Apr. 11, 2018) at 54. The court ordered a second competency evaluation. The evaluator again found Smith competent to stand trial.

Smith continued to argue to the trial court that he wanted to represent himself. At defense counsel's request, the court ordered a mental health evaluation to determine

Smith's sanity or diminished capacity.[1]  With respect to whether Smith had the mens rea to commit the charged offenses, the evaluator concluded: "'[I]t is . . . likely that Mr. Smith experienced reduced mental status due to symptoms of delusional disorder which overshadowed his rational thinking and impulse control abilities.'"  Clerk's Papers (CP) at 34.  Smith, with counsel, proceeded to trial under a theory of diminished capacity due to mental defect.

During voir dire of Smith's second jury, Smith exclaimed, "For the record, Attorney Ajax, you are fired because you don't listen to me and you are jeopardizing my innocence."  RP (Mar. 7, 2018) at 161.  The court excused the venire jury and Smith continued, "Keep that in mind, jurors.  Thank you. . . .  As you are leaving, she does not represent me."  RP (Mar. 7, 2018) at 161.  After continued argument and outbursts with the court, the court removed Smith to a media room.  Smith remained in the media room for the first day of trial, but returned to the courtroom the second day of trial.

---

[1] The trial court's findings in support of its order state in part: "The defendant is competent to proceed to trial.  The defense notified the prosecution that it intends to rely upon the defense of . . . insanity . . . and/or [lack of] capacity to have a particular state of mind . . . .  Independent evaluator, Dr. Jameson Lontz, previously evaluated the defendant and supports that affirmative defense."  Clerk's Papers (CP) at 26.

The jury found Smith guilty of both counts. The court convicted Smith and sentenced him to 13 months on each count, to run concurrently, with credit for time served.

Smith timely appealed.

ANALYSIS

Smith contends the trial court committed two errors. He claims the court erred by revoking his right to proceed pro se and the court erred by not adequately considering his subsequent requests to proceed pro se.

We review a trial court's denial of the right to self-representation for an abuse of discretion. *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 667, 260 P.3d 874 (2011). A trial court abuses its discretion if its "decision is manifestly unreasonable or 'rests on facts unsupported in the record or was reached by applying the wrong legal standard.'" *State v. Madsen*, 168 Wn.2d 496, 504, 229 P.3d 714 (2010) (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

The Washington Constitution expressly guarantees criminal defendants the right to self-representation. WASH. CONST. art. I, § 22. The Sixth Amendment to the United States Constitution implicitly guarantees this right. *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Courts regard this right as "so fundamental

that it is afforded despite its potentially detrimental impact on both the defendant and the

administration of justice." *Madsen*, 168 Wn.2d at 503. Improper denial of the right to

represent oneself requires reversal, and no showing of prejudice is required. *Id.*

Smith emphasizes that he has a constitutional right to represent himself and

repeatedly cites *Madsen* for the proposition that a trial court must honor this constitutional

right even though self-representation might be detrimental to the defendant or a burden on

the efficient administration of justice.

In *Madsen*, the defendant requested three times to proceed pro se. The first time,

the trial court appointed new counsel and deferred ruling on the motion. *Id.* at 501. The

second time, the trial court expressed concerns about Madsen's competency, stated its

desire for someone to find out if Madsen was competent, appointed new counsel, and

denied the motion. *Id.* at 501-02. The third time, the trial court denied the motion

because it was made on the eve of trial and granting it would obstruct the orderly

administration of justice. *Id.* at 502-03. The trial court entered a written order that stated

that Madsen, during the third hearing, had been "'extremely disruptive,'" "'repeatedly

addressed the court at inopportune times,'" and "'consistently showed an inability to

follow or respect the court's directions.'" *Id.* Madsen was convicted, and the Supreme

Court accepted his petition for review to determine whether the trial court erred in

denying his motion to proceed pro se.

The *Madsen* court determined that Madsen's second request to proceed pro se was

unequivocal, timely, voluntary, knowing, and intelligent. *Id.* at 506. It explained, if the

trial court had concerns about Madsen's competency, the trial court should have ordered a

competency hearing. *Id.* at 510. The *Madsen* court concluded that the trial court erred in

denying Madsen's second request to proceed pro se. *Id.*

We contrast *Madsen* with *Rhome*. In *Rhome*, our Supreme Court explained that

the right of self-representation does not extend to persons who lack the mental capacity to

represent themselves. *Rhome*, 172 Wn.2d at 661-62; *see also State v. Englund*, 186 Wn.

App. 444, 457, 345 P.3d 859 (2015). We quote *Rhome* at length because it squarely

addresses all of Smith's arguments raised on appeal:

> [T]he *Edwards*[2] Court . . . held that it is constitutionally permissible for a
> state to deny a defendant pro se status "on the ground that [he] lacks the
> mental capacity to conduct his trial defense" even though he was found
> competent to stand trial. *Id.* at 174.
>     The *Edwards* Court observed that the standard to determine whether
> a defendant is competent to stand trial assumes he will *assist* in his defense,
> not conduct his defense, and therefore competency to stand trial does not
> automatically equate to a right to self-representation. *Id.* at 174-75. In
> addition, while the dignity and autonomy of an individual underscore the
> right to self-representation, in the *Edwards* Court's view,

---

[2] *Indiana v. Edwards*, 554 U.S. 164, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008).

a right of self-representation at trial will not "affirm the dignity" of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel. To the contrary, given that defendant's uncertain mental state, the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling.

*Id.* at 176 (citation omitted) (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 176-77, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984)). Furthermore, "insofar as a defendant's lack of capacity [for self-representation] threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." *Id.* at 176-77. Finally, in addition to a concern that the proceeding be fair, the *Edwards* Court also worried that self-representation in this context might damage the appearance of fairness observers expect from our justice system. *Id.* at 177.

*Rhome*, 172 Wn.2d at 659-60 (some alterations in original).

The *Rhome* court discussed *Kolocotronis*, 73 Wn.2d 92, and confirmed

*Kolocotronis* . . . allows a trial court to limit the right to self-representation when there is a question about a defendant's competency . . . to act as his own counsel, even if the defendant has been found competent to stand trial. This reflects concern for a defendant's right to a fair trial and due process of law.

*Rhome*, 172 Wn.2d at 661-62.

If there are sufficient facts in the record, we defer to the trial court's finding that a defendant lacks the mental capacity for self-representation. This is because the trial court communicates with and observes the defendant's nonverbal behavior. *Englund*, 186 Wn.

11

App. at 454 n.5. Nonverbal behavior is often inadequately reflected in the written record on review.

Here, the trial court did not make any express finding why it revoked Smith's self-represented status. Nevertheless, an appellate court may examine the trial court's oral comments to determine the basis for its decision. *State v. Kronich*, 131 Wn. App. 537, 543, 128 P.3d 119 (2006), *aff'd*, 160 Wn.2d 893, 161 P.3d 982 (2007). After the trial court declared a mistrial, it scheduled a hearing. In that hearing, the court explained to Smith its reasons for revoking his self-represented status and appointing counsel. The court explained to Smith that his mental health issues caused him to engage in such a high degree of disruptive behavior that "there's no reasonable likelihood that you can effectively represent yourself." RP (Mar. 14, 2018) at 41. We construe this comment as a finding that Smith lacked the mental capacity to represent himself. Such a finding is well supported by the record.

We distinguish this case from *Madsen*. Here, the trial court twice ordered a competency evaluation. Although both evaluations concluded that Smith was competent to assist trial counsel, they did not conclude that Smith had the mental capacity to conduct his own defense. As noted in *Rhome*, one may be competent to assist trial counsel but lack the mental capacity to conduct one's own defense. 172 Wn.2d at 659. A medical

12

evaluation later concluded that Smith's mental capacity was sufficiently impaired that he lacked the impulse control to comply with the no-contact order. Impulse control was an important consideration in the trial court's finding that Smith lacked the mental capacity to represent himself. The trial court's finding, supported by a medical opinion, combine to distinguish this case from *Madsen.*[3] The facts here fit squarely within the rule announced in *Rhome*.

Consistent with *Rhome*, the trial court properly revoked Smith's self-represented status and appointed counsel. This was necessary to protect Smith's constitutional rights to a fair trial and due process of law. We conclude the trial court did not abuse its discretion in doing this. Because there is no evidence that Smith's mental capacity improved, we also conclude the trial court did not err in denying Smith's later requests to represent himself.

---

[3] A medical opinion is not required for a trial court to find that a defendant lacks the mental capacity for self-representation. But such an opinion will likely avoid a successful appeal of the issue. In *Englund*, the majority and the dissent disagreed whether the defendant's lack of capacity to represent himself was due to a lack of skill and education or due to a mental impairment. An expert opinion can be helpful in making this important distinction. A lack of skill or education is an improper basis to deny a defendant's request for self-representation.

No. 36552-2-III; No. 36553-1-III
*State v. Smith*


Affirmed.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Pennell, C.J.                             Fearing, J.


14