406 P.2d 388

**STATE of Arizona, Appellee,**

v.

**Thomas A. WESTBROOK, Appellant.**

**No. 1385.**

Supreme Court of Arizona,

En Banc.

Oct. 7, 1965.

Darrell F. Smith, Atty. Gen., Robt. W. Pickrell, former Atty. Gen., Paul G. Rosenblatt, Asst. Atty. Gen., and Robt. Corbin, Maricopa County Atty., for appellee.

Clyde E. Douglas, Phoenix, for appellant.

UDALL, Justice.

The appellant, Thomas A. Westbrook, hereinafter called defendant, was found guilty of first degree murder in a trial by jury in the Superior Court of Maricopa County. The jury fixed the penalty at death. He now appeals.

Defendant, in September 1961, engaged the law firm of Tognoni, Parsons, Birchett & Gooding, of Phoenix, to represent him in the matter of his claim before the In-

dustrial Commission of Arizona. Mr. William K. Strong was the attorney in the firm assigned to handle defendant's case. Following a hearing at the Industrial Commission in October, 1961, at which Strong represented the defendant, an award was entered in November 1961, granting a sum for loss of wages and allowing medical expenses only to the date of the October 1961 hearing, on the ground that his condition was stationary, requiring no further medical treatment.

Strong claims to have explained to defendant that should this award be protested because of the termination of the medical benefits, the award for loss of wages would not be paid at that time. Strong testified that defendant agreed for this reason not to contest this award. Defendant, however, denies he was ever told of this award by Strong, and testified the first he knew of it was when he received a letter from the Industrial Commission in December, 1962 advising him that he could not receive further medical benefits because he had not protested the November 1961 award within the required twenty-day period.

Defendant, immediately upon receiving this letter, went to the firm's office. He declares that his purpose in doing so was to ask Strong to accompany him to the Industrial Commission to try to reopen his case, notwithstanding that the attorney-client relationship had been severed some months before. Defendant was carrying a revolver when he went to the law office at about 11 a. m. on December 28, 1962. He explains his carrying this gun by stating that he carried it for protection, as he had been assaulted once by robbers, and, also, because he was afraid to go unarmed to the Industrial Commission. This revolver was in a holster on his belt under his coat.

Defendant met Mr. Birchett, the deceased, as he was riding up in the elevator on his way to see Strong. Defendant told the deceased he wanted to talk with Strong about his Industrial case and asked deceased if he would be present during this conference. The deceased had defendant wait in the reception room of the law office while he went to Strong's office and notified Strong that defendant wished to see both of them. Deceased waited in Strong's office while the latter conducted defendant into Strong's office.

The only witnesses to the events culminating in the death of Birchett were Strong and defendant. Strong's version of these events is as follows: Deceased sat at the southeast corner of Strong's desk. Strong sat behind his desk, facing east, and defendant sat across from Strong, facing him. Defendant immediately produced the letter he had received that morning from the Industrial Commission and gave it to Strong, saying to him that the Commission had told him that the reason he could not reopen his case was because Strong had not protested his award. Strong read the letter, then

gave it to the deceased, who then read the letter, placed it back onto the desk, and asked Mr. Westbrook, "What is your purpose in being here today? We are not representing you now. We will not represent you in the future. What is your purpose here today?"

All the conversation to this point was calm and no one had made any threats or raised their voices. Strong then testified that at this point defendant arose from his chair and pulled a revolver from underneath his coat. Strong, upon seeing the revolver immediately dived behind his desk; the last thing he saw when he did so was defendant standing there with a revolver and deceased still seated; that upon his falling onto the floor he immediately heard two or three shots fired. He waited a moment or two, then jumped up and at that time saw deceased walking out the door of the office. He saw defendant standing there where he had been when he first stood up and drew the gun, but that now he was facing south pointing the revolver in a southerly direction, toward the chair where deceased had been seated.

Strong immediately rushed defendant and grappled with him, whereupon they both fell against the east wall of the office and then to the floor. Strong stated he "believed" defendant's head struck the rung of the chair in which deceased had been sitting. He did not see defendant's head strike this chair but did see blood on two rungs of this

chair. He saw blood on the back of defendant's head and saw blood on the carpet where his head was lying. Strong called for assistance and others promptly arrived and wrested the gun from defendant, who then continued lying upon the floor.

The deceased had been shot in the chest and left shoulder and left forearm. The examining physician stated the latter wound could have resulted from one of the bullets that inflicted the other wounds. Deceased died from these wounds within a short while.

Mr. Westbrook's version of the facts relating to this shooting varies considerably from that of Strong. He agrees that the three men were seated in Strong's office in the position indicated by Strong. After deceased examined the letter from the Industrial Commission defendant states that Strong then placed the letter in the envelope. When defendant reached over and attempted to retrieve the envelope Strong refused to turn it loose. Defendant pulled on the envelope but Strong still held onto it. The latter started pulling the envelope and as he did defendant leaned over the desk still holding onto the envelope with both hands, and in such a bent-over position that his face was near the desk top, face down.

As he was in this position, defendant testified that he was struck with a hard object upon the head, toward the back of his head, with such force as to stun him and

cause a deep laceration necessitating several sutures. When defendant got up he observed deceased still seated to his left, and saw Strong standing on the opposite side of the desk. Strong then started around the desk toward him in "a harried manner," whereupon defendant pulled his gun from the holster. Before he could clear the gun from the holster Strong came up close to him and started striking him upon the shoulders with both hands. While defendant was being thus buffeted about the gun fired once. Defendant was then pushed to the floor by Strong. After he sat up deceased then took hold of the barrel of the gun and in the ensuing struggle for possession of the gun it again discharged. Deceased then dropped to one knee and one hand and defendant says he then knew deceased was hit.

Strong and defendant then again struggled and the gun fired twice. The latter was again knocked to the floor by Strong, where he lay until others came into the room, stepped on defendant's wrists and removed the gun from his hand.

Defendant, insisting upon representing himself, was tried by a jury and on April 12, 1963 was convicted of first degree murder with the penalty set at death.

The defendant's first assignment of error states that the court erred in determining that defendant was able to understand the proceeding and conduct his own defense. It is his contention that an accused should not be tried for a criminal offense if he is unable to understand the nature or object of the proceedings against him and to conduct his defense in a rational manner.

There was a pre-trial hearing conducted by the court under the provisions of Crim. Rule 250, 17 A.R.S. Three competent psychiatrists were appointed by the court to examine the defendant and, at the conclusion of their examination it was their unanimous opinion that within the meaning and purpose of Rule 250 the defendant understood the nature of the charges against him and could assist in his defense. Thereafter the court made a determination that defendant was able to understand the nature of the charges against him and could assist in his defense; and "that he was neither mentally defective nor insane and could proceed to trial."

Defendant contends, however, that there is a distinction between being able to assist in his defense and in being able to conduct his own defense. This contention would infer that there are two tests to be made, (1) that he understood the nature of the charges against him and is able to assist in his defense, and (2) that he understood the nature of the charges against him and was able to conduct his own defense. This contention is entirely fallacious since the law makes no such distinction. Neither under Rule 250 nor under any other criminal rule, or law of the state of Arizona,

and lacking special circumstances, is the trial court required to set a hearing to determine whether the defendant through insanity or mental deficiency was not able to conduct his own defense.

In Arizona there is an explicit right given by the Constitution to defend one's self. This right is of equal stature with the right to the assistance of counsel. Art. 2, § 24, Const. of Arizona, A.R.S., provides:

"In criminal prosecutions, the accused shall have the right to appear and defend in person, and by counsel, * *."

At the preliminary hearing in this case the defendant was advised by the justice of the peace of his right to counsel, and the justice of the peace—through the superior court—obtained an order appointing an attorney to represent defendant. The defendant, however, refused the services of counsel that were offered to him. Defendant employed two attorneys to represent him at the outset but later they both were discharged by him at the beginning of the preliminary hearing, at which point forward he insisted upon defending himself.

In the case of Burgunder v. State, 55 Ariz. 411, 103 P.2d 256, the defendant was charged with murder in the first degree. The court first denied defendant the right to defend himself but later this order was vacated and the court ruled that he did have the right to defend himself. In analyzing the facts this Court stated:

"Defendant insists that the action of the court in first denying him the right to defend himself and thereafter granting him such right violates Section 24, Article II of the state Constitution, which provides: 'In criminal prosecutions, the accused shall have the right to appear and defend in person, and by counsel, * * *.' It does not seem to us defendant's contention is right either in fact or law. The court's action was induced by defendant's own equivocation. It appears he was able to employ an attorney and did so when first charged with the offense and Judge Speakman's order requiring such attorney to continue his services was for the protection of defendant who, presumably, because of his youth and inexperience and the nature of his defense of insanity, was unable to defend himself intelligently. This order, although in the interests of defendant, was probably erroneous. If, however, he was entitled to defend himself without the assistance of counsel, the court offered to let him do so. He asked for counsel. Actually, he was permitted 'to appear and defend in person, and by counsel.' Sec. 24, art. II, supra. He was given, and he accepted, full measure of the constitutional right."

In State v. Van Bogart, 85 Ariz. 63, 331 P.2d 597, we held:

"There can be no doubt that a defendant is entitled to defend himself under the provisions of the Constitution if he so desires."

In the recent annotation (1961), 77 A.L.R. 2d 1233, entitled "Right of Defendant in Criminal Case to Conduct Defense in Person, or to Participate with Counsel", the rule is stated at 1235:

"It is generally recognized that in the absence of unusual circumstances a defendant in a criminal case, who is sui juris and mentally competent has the right to conduct his defense in person, without the assistance of counsel."

The testimony of Dr. McGrath, one of the psychiatrists appointed to examine the defendant relative to his ability to understand the nature of the charge against him and to assist in the conduct of his defense; as well as the Doctor's testimony relative to defendant's ability to conduct his own defense, shows quite clearly that the Doctor was of the opinion the defendant did have the mental ability to proceed with the trial.

Quoting from the record, we find:

"Q Now, Doctor, based on the history as given to you by the defendant and the information that he gave you pertaining to the crime, were you able to determine, as a result of your examination, as to whether the defendant can understand the nature of the charges against him and whether he can aid counsel in his defense if he did have counsel?

"A Yes, I am able to express an opinion.

"Q And what is that opinion, Doctor?

"A That he is able to understand proceedings and to aid counsel.

"Q Now, Doctor, as the result of your examination, I just want to pursue this for one question, as a result of your examination would you be able to express an opinion whether he was or was not sane at the time the act was committed?

"Now, just yes or no, as a result of your examination.

"A Yes."

* * * * *

MR. CHOISSER, cross-examining Dr. McGrath:

"Q Did he [defendant] inform you that he, it was his determination to defend himself in this matter without the aid of counsel?

"A No.

"Q If it should appear from the records that that is true, and that he is before the Court in his own defense, would your answer be the same then as if the answer to aid counsel—do you think he is able to

defend himself in this matter mentally?

"A May I qualify my answer a little bit?

"Q Whatever your answer is, Doctor, you are at liberty to make it.

"A So far as the presence of any mental disease or defect is concerned, I think he is able to aid counsel in either event.

"Q Yes. Now, assuming there is no counsel in this case, would your answer be the same?

"A Yes.

"Q And it is your answer, then, that knowing that there is no counsel to aid him in this matter, you are of the opinion that he is mentally able to conduct his own defense in this matter.

"A Yes, so far as the presence or absence of a mental disease or defect is concerned."

\* \* \* \* \*

It is very apparent that this assignment is without merit.

Defendant next claims the court erred in commenting on the evidence while questioning the jury panel prior to the presentation of evidence at the trial. It is defendant's contention that the court, while questioning prospective jurors on voir dire, asked each of the prospective jurors whether they could vote for the death penalty if the evidence so warranted. It is asserted that this question was asked many times and was given undue emphasis.

Since the prospective jurors had the serious problem of determining whether the death penalty should be imposed in this case, it was the court's duty to make clear to each prospective juror that they would have the responsibility of passing judgment as to the degree of the offense and in fixing the punishment if they found the defendant guilty of murder in the first degree. The question propounded by the court to each prospective juror was similar to the one asked Juror Loving:

"Mr. Loving, do you have any conscientious or religious opinion which would preclude you from voting for the death penalty?

JUROR LOVING: "No, sir.

THE COURT: "And if you were in the jury deliberating room and the jury had determined that this was murder in the first degree, and you were asked to vote as to the penalty, in a proper case could you vote for the death penalty?"

The record shows that as a result of the foregoing questions some 29 prospective jurors were excused. It is apparent that this assignment of error is without sub-

stance and should be rejected. See, Young v. State, 38 Ariz. 298, 299 P. 682.

█ The defendant next claims the court erred in making improper remarks during the trial. The record would indicate that this contention is groundless. The whole proceedings showed great patience and restraint by the trial court in the conduct of the trial. The defendant was permitted to put in evidence every scrap of paper or object he wished without reference to its relevancy. He was allowed, in effect, to "try" the Industrial Commission and witness Strong in his efforts to justify his actions to the jury. Of the 18 instances cited by defendant where he says the court made improper remarks, eight took place during the cross-examination of the defendant himself when he refused to answer direct questions put to him; five statements were made by the court to stop defendant from arguing with the court; two of the court's statements were in the course of defendant's testimony on redirect when he was proceeding to tell his entire version of the case over again; two of the statements by the court were explanatory to the defendant, and one was to stop a witness from volunteering testimony after he had fully answered the question put to him.

We stated in State v. Van Bogart, supra:

" * * * it is not only the right but the duty of a presiding judge to maintain order and decorum in the courtroom while the court is in session. The failure to do so would quickly bring the court into disrepute to the extent that it could neither demand nor command the respect of the public. The methods employed by the court to maintain order and dignity in the courtroom are commensurate with the necessities of each case."

This assignment of error is devoid of merit.

█ The defendant further claims the court erred in appointing Attorney William T. Choisser, as amicus curiae, to aid and assist defendant in the conduct of the trial. Defendant refused counsel and informed the court that he would not employ counsel; that he would conduct the case in propria persona. The court pointed out, before the prospective jurors, that defendant was defending himself and that Mr. Choisser was appointed only "to aid and assist" the defendant and the court. There was no inference contained in the order of the court that the appointed attorney would supplant defendant in conducting the defense during the trial. This procedure has been uniformly followed by the trial court of Arizona. See Burgunder v. State, supra, and State v. Van Bogart, supra.

Referring to this problem in states where the accused has a right to appear in person and by counsel, it is stated in 23 C.J.S. Criminal Law § 979(4) at page 930:

> *"Right to appear in person and by counsel.*
>
> "Ordinarily accused must either conduct his own defense or be represented by counsel and cannot combine both; accused has no right to be heard both in person and by attorney; where he is conducting his own defense, he has no right to have an attorney speak for him and he is not entitled to speak for himself where he is represented by counsel. However, the trial court may, in its discretion, permit an accused * * * appearing *in propria persona* to employ an attorney to sit by and advise him during the presentation of the case, *or may even appoint an attorney, with the attorney's consent, to render advisory services* to an indigent accused wishing to represent himself." (Emphasis added.)

The record shows that Mr. Choisser did not inject himself into the proceedings in any manner whatsoever to mislead or prejudice the defendant's cause before the jury. There is no merit to defendant's contention.

Defendant next asserts the court erred in allowing the empaneling of persons who were either mentally deficient, incapable of effective observation, or untruthfulness, to be selected to sit as jurors to try the case. The claim is made that these jurors were either lacking in intelligence, sobriety, and soundness of mind, or they were all quite indifferent to the truth vitally bearing upon their qualifications to serve as jurors.

Defendant contends that since the court propounded the following questions to all prospective jurors:

> "Is there any one of you who now has a recollection of having read anything in the newspapers or heard anything in radio or television with reference to this particular matter?"

and the entire panel made no response it shows they lacked intelligent, sober, sound minds and good moral character to qualify them under § 21–201 A.R.S. (1956). The court had previously informed the prospective jurors that by their lack of response to such a question it would be assumed that their answer would be in the negative.

The alleged crime occurred on December 28, 1962, and the matter went to trial on the 12th day of April 1963. It is entirely possible that all of the jurors had no independent memory of this occurrence, even though it had been published in the papers. Furthermore it is quite apparent that some response was made by some members of the jury panel, either by the show of hands or otherwise, since the court found it advisable

to explain to the prospective jurors the difference between a qualified, and a fixed opinion. The statements of the court to the jury are as follows:

"Is there any one of you who has had some reading or listening information relative to this case, who has an unqualified or rather fixed opinion with reference to the merits of the case?"

The court further stated:

"I take it then that those of you who have read in the press, perhaps heard on radio or television something of what are supposed to be the facts in this case, honestly and sincerely believe that you can try this case based upon the matters as presented here in the courtroom."

It is evident that the preceding question, and the subsequent comment by the court, are based upon a showing of hands in response to the initial question, rather than a failure of anyone to respond as defendant contends. Cf. State v. Hilliard, 89 Ariz. 129, 359 P.2d 66. This assignment is totally without merit.

The defendant, as his final assignment of error, contends the court erred in denying his motion for a new trial upon the ground that the verdict was contrary to the weight of the evidence and the sentence imposed was excessive.

Defendant argues that the evidence negates premeditation or deliberation on the part of defendant to kill anyone. He gave groundless and unrealistic reasons for carrying the weapon on the day of the shooting, stating it was for protection as he had been assaulted once by robbers and because of his fear of going to the Industrial Commission without it.

It is well settled that deliberation and premeditation may be inferred from circumstances surrounding the commission of the crime. State v. Izzo, 94 Ariz. 226, 383 P.2d 116; State v. Singleton, 66 Ariz. 49, 182 P.2d 920.

Defendant's contention that the verdict is contrary to the weight of the evidence and that the sentence imposed was excessive is not borne out by the record. In considering the record we are compelled to view the evidence in the light most favorable to upholding the jury's conclusion. State v. Cravin, 96 Ariz. 346, 395 P.2d 706; State v. Maxwell, 95 Ariz. 396, 391 P.2d 560. The evidence clearly sustains the jury's verdict. The record shows that after defendant received the letter from the Industrial Commission [Exh. 16] informing him of the action that had been taken by the Commission, he proceeded with his gun to the law offices of the deceased and his associates. Defendant, the deceased, and Mr. Strong went to Strong's office to discuss the case and in the course of the discussion defendant was informed by the deceased: "We are not representing you now. We

will not represent you in the future. What is your purpose here today?" Without any legal provocation the defendant jumped to his feet and pulled a revolver from underneath his coat. As Strong dived behind his desk he noticed the defendant was standing with a revolver in his hand and that the deceased was seated in the chair where he had been during the course of the conference; that immediately after Strong had fallen to the floor he heard two or three shots fired. In a moment or two thereafter he jumped to his feet and saw deceased walking out of the door of the office and the defendant standing where he had been, facing the chair where the deceased had been seated when defendant first stood up and drew the gun. Strong immediately rushed the defendant and grappled with him, and in the course of a very few moments Strong and those who came to his assistance wrested the gun from the defendant. As defendant was escorted from the office by the police he looked at Strong and said: "I will get you yet." The deceased had been shot in the chest and left shoulder and left forearm. Deceased died from these wounds shortly thereafter. It is apparent that the circumstances were sufficient to justify the jury in believing that every reasonable hypothesis was excluded other than defendant's guilt. See State v. Izzo, supra; Moore v. State, 65 Ariz. 70, 174 P.2d 282.

■ It is abundantly clear that the verdict of the jury was not contrary to the weight of the evidence nor was the punishment fixed by the jury excessive. Although the testimony of defendant did raise a conflict as to the facts, the verdict which is supported by very substantial evidence resolved that conflict. In State v. Rivera, 94 Ariz. 45, 381 P.2d 584, we said:

"Although the testimony was in conflict as to the exact facts surrounding the struggle itself, this Court is not concerned with mere conflict of evidence if there is substantial evidence in support of the verdict and judgment below."

There being no error the judgment is affirmed.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and BERNSTEIN and McFARLAND, JJ., concurring.