[Crim. No. 15224. First Dist., Div. Two. Apr. 28, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
VLADIMIR ALEXANDER ZATKO, Defendant and Appellant.

## COUNSEL

Paul N. Halvonik, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, Peter R. Silten and Harriet R. Wiss, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., Derald E. Granberg and Laurence M. May, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WHITE, J.*—**This is an appeal by defendant Vladimir Zatko from a judgment convicting him of violating section 4500 of the Penal Code, in that while serving a life sentence in state prison, he, with malice aforethought, assaulted a person who was not an inmate with a deadly weapon or instrument.

### ISSUES PRESENTED

1. Did the trial court fail to determine if defendant was competent to act as his own attorney?

2. During trial did substantial evidence develop requiring the court to order a Penal Code section 1368 mental competency hearing?

3. Should defendant's motion to quash the indictment have been ruled upon and granted by the trial court?

4. Was defendant prejudiced by being restrained during the trial?

5. Should the trial court have instructed the jury to disregard the restraints?

### STATEMENT OF FACTS

There is no dispute as to the evidence produced at the trial, and the same may be summarized as follows: On the afternoon of April 4, 1974,

*Assigned by the Chairperson of the Judicial Council.

defendant Zatko, who was serving a life sentence in San Quentin State Prison, went to the office of Chaplain Harry Howard and stated that he wanted to see him. When Howard told defendant that he was busy at the time, defendant sat down on a chair in the chaplain's office, pulled up his pants leg and revealed a knife which was strapped to his leg. Defendant removed the knife from his leg and told Howard not to call for help or he would be killed.

When the prison security force subsequently arrived on the scene, defendant positioned himself behind Howard, held the knife at his throat and told the security officers that if they came any closer, he would kill Howard. The security officers retreated into the hallway, and defendant then stated that he wanted to speak to Captain Merkle. When Merkle arrived at the scene, defendant told him that he wanted a representative from the FBI brought to him within 15 minutes or he would kill himself. Defendant told Captain Merkle that the file on his case would prove that he was innocent of the crimes of which he had been convicted, and he also stated that he did not want to be deported. Captain Merkle left the scene and, shortly thereafter, an armed security officer rushed in from the hall. Defendant cried out to the officer not to shoot, and he threw his knife in the air and fell to the ground. Defendant was restrained by the security officers and carried from the scene. Chaplain Howard was unhurt, with the exception of two small nicks on his throat.

Defendant, testifying in his own behalf, admitted that the testimony of the prosecution witnesses concerning the events of April 4, 1974, was essentially correct. Defendant testified that he had deliberately planned the April 4 incident because he believed that when he was brought into court and tried for such conduct, he would have the opportunity to prove that he was innocent of the offenses which had resulted in his prison sentence. Defendant further stated that before he planned the April 4 incident, he had also taken into consideration the possibility that when he was tried for such conduct, the court might not permit him to present any evidence bearing upon his prior convictions. Defendant had concluded that it was still to his advantage to go ahead with the April 4 incident because if he were convicted of assaulting the chaplain, he would be confined in San Quentin for many more years and could not be paroled and deported to Czechoslovakia. Defendant explained that he left Czechoslovakia illegally in 1964 and that if he were deported to that country, he believed that he would be sent to a Siberian slave-labor camp for the rest of his life, an alternative which defendant considered far more dire than remaining in San Quentin. Defendant therefore asked the jury

to convict him of assaulting the chaplain unless the court gave him the opportunity to prove his innocence of the prior offenses.

## DISCUSSION

1. *Did the trial court fail to determine if defendant was competent to act as his own attorney?*

In the course of defendant's pretrial hearings, the criminal proceedings were suspended and defendant was declared incompetent to stand trial under Penal Code section 1368.[1] The criminal proceedings were suspended from December 26, 1974 until September 3, 1975, when after receiving two psychiatric reports which stated defendant was presently competent to stand trial, the court ordered that defendant be returned to the court and the criminal proceedings resumed. Defendant appeared on November 5, 1975. His harassed attorney sought to invoke Penal Code section 1368 proceedings.

On November 5, 1975, during pretrial proceedings, Judge Best declared a doubt as to appellant's present sanity and instituted proceedings pursuant to Penal Code section 1368.[2] Drs. Eiland and Pouteau were

[1]Judge David J. Menary, Jr., found that Mr. Zatko "does understand the nature and purpose of the criminal proceedings taken against him" but "is not able to assist counsel in the conduct of his own defense in a rational manner" and therefore is not sane within the meaning of Penal Code section 1368. He committed defendant to the California Medical Facility at Vacaville.

[2]On November 5, 1975, Mr. Toney sought in open court Mr. Zatko's consent for a time waiver for trial, permission or consent to enter a plea of not guilty by reason of insanity. Mr. Zatko refused to respond vocally, either to Mr. Toney or the court. The court inquired as to whether he knew where he was today, the identity of his attorney, or the court. Whereupon, the court declared a doubt and proceeded to appoint two doctors, Dr. Laughlin and Dr. Sutton of the state prison, who had previously examined the defendant in Penal Code section 1368 proceedings.

We note that the record reflects that the court actually suspended temporarily criminal proceedings stating: "We're stopping everything for the moment until we have resolved this 1368 issue."

Whereupon, Mr. Zatko spoke up, "Your Honor, would there still be enough time to ask [*sic*] you those questions you asked me a little while ago?" He then continued, stating Toney's name and the court's name, "Charles Read Best," and declaring the issue of 1368 "is entirely false"; declaring himself perfectly sane; refusing to consent to an insanity plea; and "I hereby present a motion to this Honorable Court for self-representation." He stated that "I am perfectly of—capable to handle my own case in court. I am—studied law; I am skillful in criminal matters and I believe that I will not disappoint the court during the trial proceedings." He also related that he was in Marin County Courthouse, Hall of Justice, in San Rafael.

The court took the "Faretta" motion under consideration and decided "still going to go along at this point with 1368 proceedings and see how we come out there."

Mr. Zatko then made his position adamantly clear as follows: "I am not 1368 . . .

then appointed to examine defendant. As defendant refused to see Dr. Pouteau, the court relied upon Dr. Eiland's report and on December 1, 1975, found defendant sane within the meaning of Penal Code section 1368.[3] The court made a finding on the record that the defendant was sane enough to proceed with the action. The court then granted defendant's motion to represent himself on the ground once defendant had been declared sane enough to proceed, he had an absolute right to defend himself under *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].

The trial court understood the serious and weighty responsibility of determining that Mr. Zatko was making an intelligent and competent waiver of his right to the assistance of counsel.

Before the trial judge granted defendant's motion to represent himself, the judge at some length indicated the problems defendant would encounter if he represented himself. The trial judge strongly advised defendant not to represent himself. Defendant stated he is an attorney who received a degree from Lomonosov University in Moscow.

The trial judge pointed out all the pitfalls of in-custody self-representation from pretrial preparation to in-court presentation. Defendant was warned that he would receive no special privileges; that he would be bound by the technical rules of law and that as a consequence he may unknowingly waive "constitutional, statutory and common law rights"; and that he could not expect the district attorney to assist in the

---

specifically Dr. McNeil [*sic*] and Dr. Dulle [*sic*] stated that I am fit to stand trial; that means: I'm not 1368. Now, that's a declaration of two psychiatrists. Now, do I have to go through this same mockery of justice again?" He went on at length indicating that he would not cooperate with any psychiatrists saying, "This is . . . a waste of taxpayers' money. . . ." "*And, please let me represent myself and let's go on with this, let's go to trial with it because I'm not going to waive my rights to speedy trial, . . .*" (Italics added.)

What follows are six pages of transcript in which it appears that all the discussion is between Mr. Zatko and the court in which Mr. Zatko successfully represented himself in prevailing upon the court to appoint two "independent" doctors that were agreeable to Mr. Zatko: Drs. Murray Eiland and Jean L. Pouteau. The matter was continued to November 19 for doctors' reports.

[3]On November 19, 1975, Mr. Zatko appeared with Mr. Briggs of the public defender's office. The records reflect that Mr. Zatko refused to see Dr. Eiland because he "showed up on November 18th at 4:00 p.m." Mr. Zatko then explained to the court that because the psychiatrists failed to follow the court order, he was refusing to be examined by them. He again requested a ruling on self-representation asserting "I have been charged with a violation of Penal Code, Section 4500, which bears a mandatory sentence of nine years to life." He agreed with the court's observation that it is one of the most serious offenses in the State of California.

defense of the case. Further, defendant was informed that he would be expected to assert pretrial motions and trial objections without the court's initiative.

The court implored the defendant to accept the "help of an experienced lawyer such as Mr. Toney." Having made it clear that he questioned the wisdom of Mr. Zatko's decision to represent himself, the court asked, "I take it it's still your wish to represent yourself in this matter; is that correct?" To which Mr. Zatko replied without hesitation, "I certainly do so, sir."

When defendant's *Faretta* motion was granted, the court ordered a representative from the Marin County Public Defender's office to be present and available at all times. During trial and after the first witness had testified, defendant decided to formally associate Harry Allen from the public defender's office as cocounsel.

█ Defendant contends on appeal that there are two separate and distinct levels of mental capacity—one to stand trial, another to waive the right to be represented by counsel and to act as one's own attorney. Defendant asserts that when a defendant desires to proceed *pro se*, the trial court must first determine whether he is competent to stand trial. If he is, defendant claims there must be a second determination of his competency to waive counsel and represent himself. Defendant contends because no further medical inquiry was made to determine whether defendant was mentally competent to represent himself, the conviction must be reversed. While we agree that the mental competency to stand trial under Penal Code section 1368 is not to be equated with competency to waive the right to the assistance of counsel, we disagree with defendant's assertion that because of a history of mental illness, to wit, schizophrenic reaction of the paranoid type, that further medical inquiry or hearing is required before he is granted his right of self-representation.

In *State* v. *Westbrook* (1965) 99 Ariz. 30 [406 P.2d 388], the defendant, prior to trial, was examined by three psychiatrists who were of the unanimous opinion that he understood the nature of the charges against him and could assist in his own defense. Defendant, insisting upon representing himself, was tried by a jury and convicted of first degree murder. On appeal he argued that he was mentally incompetent to represent himself. The Arizona Supreme Court held that the trial court was not "required to set a hearing to determine whether the defendant through insanity or mental deficiency was not able to conduct his own

defense." (406 P.2d, at p. 391.) The United States Supreme Court reversed and remanded because there was nothing in the record to indicate that the trial court had queried the defendant in accordance with *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 465 [82 L.Ed. 1461, 1467, 58 S.Ct. 1019, 146 A.L.R. 357], to determine whether he made an intelligent and competent waiver of counsel. (*Westbrook* v. *Arizona* (1966) 384 U.S. 150 [16 L.Ed.2d 429, 86 S.Ct. 1320].)

In *Faretta* v. *California, supra,* 422 U.S. 806, the United States Supreme Court ruled that the denial of the right of self-representation was impermissible under Sixth Amendment mandates, assuming the decision of a defendant to represent himself is a voluntary and intelligent one. In *Faretta,* the Supreme Court found such an implicit right in the Sixth Amendment as made applicable to the states by the Fourteenth Amendment and held by forcing Faretta to accept a state-appointed public defender against his will, the California courts deprived him of his constitutional right to personally manage and conduct his own defense in a criminal case. In so holding, the court stated: "When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. *Johnson* v. *Zerbst,* 304 U.S. at 464-465. Cf. *Von Moltke* v. *Gillies,* 332 U.S. 708, 723-724 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' *Adams* v. *United States* ex rel. *McCann,* 317 U.S., at 279." (*Id.,* at p. 835 [45 L.Ed.2d at pp. 581-582].)

The Supreme Court found that the record in *Faretta* affirmatively showed that Faretta knowingly and intelligently waived his right to be represented by counsel. "The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the 'ground rules' of trial procedure." (*Id.,* at pp. 835-836 [45 L.Ed.2d at p. 582].)

In *People* v. *Reason* (1975) 37 N.Y.2d 351 [372 N.Y.S.2d 614, 334 N.E.2d 572], the New York Court of Appeals held that *Westbrook* v. *Arizona, supra,* 384 U.S. 150, did not require a trial court to make a finding as to the defendant's mental competency to waive counsel and to

proceed *pro se* under *Faretta.* The court said a finding that Reason was mentally competent to stand trial, together with a record showing the defendant's awareness of the risks and consequences of self-representation, was sufficient to show that the trial court properly allowed the defendant to waive counsel and conduct his own defense.

In *United States* v. *Odom* (9th Cir. 1970) 423 F.2d 875, a hearing was held on the defendant's competency to stand trial. After receiving testimony from two psychiatrists, the trial court found defendant was fully competent to stand trial and assist in his own defense. (*Id.,* at p. 876.) Defendant stated he wished to act as his own counsel. After the trial court interrogated the defendant at length about the wisdom of the step he was taking, the trial court granted defendant's motion to represent himself. On appeal defendant claimed he should not have been allowed to represent himself. The Ninth Circuit found that defendant had made an intelligent waiver of counsel. The court said "intelligent" was defined by whether a defendant was sufficiently informed of the consequences of his choice. (*Id.,* at p. 876.) The court quoted from *Hodge* v. *United States* (9th Cir. 1969) 414 F.2d 1040, 1043, as follows: " 'The question before the judge was not whether the defendant was professionally capable of acting as his own lawyer. Few defendants are, and the right of self-representation is not so conditioned. The question was simply whether the defendant understood the charges against him and was fully aware of the fact that he would be on his own in a complex area where experience and professional training are greatly to be desired.' " (*Id.,* at p. 876.) The court further stated that the trial court could not have denied the intelligent assertion of the right of self-representation unless it revoked its finding that defendant was competent to stand trial. (423 F.2d, at p. 877.)

In *United States* ex rel. *Konigsberg* v. *Vincent* (2d Cir. 1975) 526 F.2d 131, 133, certiorari denied, 426 U.S. 937 [49 L.Ed.2d 388, 426 U.S. 937], the Second Circuit found that *Westbrook* v. *Arizona, supra,* 384 U.S. 150, suggests "that the standard of competence for making the decision to represent oneself is vaguely higher than the standard for competence to stand trial." (See also *United States* ex rel. *Martinez* v. *Thomas* (2d Cir. 1975) 526 F.2d 750, 754.) The court in *Konigsberg* indicates that the vaguely higher standard is satisfied if a defendant is made aware of the dangers of self-representation. (526 F.2d, at p. 134; see also *United States* ex rel. *Martinez* v. *Thomas, supra,* at pp. 754-755.)

We conclude that Mr. Zatko was literate, competent and that he was voluntarily exercising his free will throughout his *Faretta* motion.

We hold that defendant voluntarily and intelligently waived counsel and asserted his right of self-representation because he was interrogated at some length about the wisdom of acting as his own counsel.[4] Although the California Supreme Court has not directly considered the issue before this court, it has called the timely assertion of the right of self-representation "unconditional." (*People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) "Accordingly, when a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be." (*Id.*)

Since this case was argued the California Supreme Court has denied a hearing in *Curry* v. *Superior Court* (1977) 75 Cal.App.3d 221 [141 Cal.Rptr. 884]. The court in *Curry* reached the same conclusion that we reach in discussing competency to make the required waiver. The court stated: "We hold that the sole issue to be determined in a *Faretta* hearing is whether the defendant has the mental capacity to waive his constitutional right to counsel with a realization of the probable risks and consequences of his action. Whether or not a defendant is competent to act as his own lawyer is irrelevant. The fact that the defendant 'may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law" [citation]' (*Faretta, supra,* 422 U.S. 806, 834 [45 L.Ed.2d 562,

---

[4]In *State* v. *Kolocotronis* (1968) 73 Wn.2d 92 [436 P.2d 774], the Washington Supreme Court stated: "[*Westbrook* v. *Arizona*] holds unequivocally, that an adjudication by the trial court that an accused is capable of going to trial and aiding his counsel, is not a determination of his competency to act as his own counsel. [¶] When the accused demands his constitutional right to act as his own counsel, the trial court is faced with the necessity of making a factual determination of the competency of the accused to: (1) intelligently waive the services of counsel, and (2) act as his own counsel." (436 P.2d at p. 781.) The Washington Supreme Court stated *past mental illness* is a factor to be considered in determining an accused's present mental competency to conduct his own defense. (*Id.,* at p. 781.)

In *Government of Virgin Islands* v. *Niles* (D.V.I. 1969) 295 F.Supp. 266, the court conducted a hearing to determine the defendant's competency to stand trial. During the course of the hearing, defendant expressed the desire to defend himself if the court found him competent to stand trial. The court found him competent to stand trial but not to represent himself, stating: "As for defendant's competency to waive counsel, the court is of the opinion that one who may be suffering from paranoid delusions should not be entrusted with the sole conduct of his defense."

*Niles* and *Kolocotronis* seem to suggest that an even higher standard should be employed than the cases mentioned in the body of this opinion used. It should be noted that these cases were decided before *Faretta* and therefore might be regarded as being inconsistent with *Faretta* which holds an accused has a constitutional right of self-representation.

581]). Whenever a psychiatric evaluation is sought to assist the hearing judge, the evaluation should be limited to competency to make the required waiver. The standard is *not* similar to that of Penal Code section 1368." (*Id.,* at pp. 226-227.)

2. *During trial did substantial evidence develop requiring the court to order a Penal Code section 1368 hearing?*

 Defendant in a supplemental brief argues that at trial the court was presented with sufficient evidence to require it to reexamine the issue of defendant Zatko's mental competence to stand trial under Penal Code section 1368.

At trial, defendant's cocounsel, Allen, requested that defendant be reexamined under Penal Code section 1368 stating: "Your Honor, it just seems to me clearly at this point that I just cannot see any other alternative at this point, to suggest to the Court once again, this is the matter of Penal Code Section 1368, as I read that. Anytime during the proceedings, the Court can reconsider that question. It just seems to me that the further that we get into this, the more evident it becomes to me in every instant, that this matter, the man is potentially a 1368." The court in denying the request stated: "Let me say this: I heard the 1368 before. I don't think he is a 1368 candidate at this point at all. He knows very well what he is doing. He is an intelligent man. He knows how to present himself, and he is doing a pretty good job."

Following the denial of Mr. Allen's request, defendant resumed his examination of Dr. Sutton, a psychiatrist who had examined defendant on numerous occasions and who testified to his competency at the first section 1368 proceeding. During this examination the following colloquy occurred: 'Q. Dr. Sutton, you stated I think, you mentioned three or four reasons why you have found me incompetent in regard to the California Penal Code Section 1368, and then we spoke about that hearing in court of Judge Menary.

"A. Right.

"Q. Now, you have stated some of your reasons. It seems to me that you have information, the one you promulgated most on December 16th, during that hearing, and the issue you actually proceeded forward with most was the reason of insanity, and as insanity being caused by some kind of mental illness.

"I don't recall specific terms you used, but you also implied mental illness on December 16th, 1974.

."Why do you not specify that reason here today? Why did you eliminate that mental illness which you alleged on December 16th, 1974?

"A. Well, I stated that you were unable to stand trial because of reasons of insanity. Okay. And the way this affected your ability to not stand trial, it affected your ability to rationally cooperate with your defense attorney on your behalf.

"Q. On which grounds?

"A. Because of mental illness.

· "Q. Mental illness?

"A. Yes. And, your mental illness caused you, for the reasons that I stated to be unwilling to, you know, or unable to cooperate with your defense attorney.

"Q. Dr. Sutton, you just made a statement in regard to mental illness. Now, as I understand it, you considered me mentally ill at the time of that hearing on December 16th, and 20th, 1974?

"A. That is correct.

"Q. Would that be correct?

"A. That is correct.

"Q. Do you consider me mentally ill at this point?

"A. Yes, I do.

"Q. Today, here?

"A. Uh-huh (affirmative).

"Q. Would you please explain why?

"MR. CONNOLLY: Your Honor, it's really irrelevant.

· "THE COURT: Yes. That is irrelevant. Objection sustained. We are not interested in your state of mind today, April 4th, 1974."

Defendant contends, in light of Dr. Sutton's testimony, Mr. Allen's request for a hearing and defendant's conduct, the trial court should have stopped the proceedings and conducted a hearing pursuant to Penal Code section 1368 and its failure to do so requires a reversal.

"A person cannot be tried or adjudged to punishment while he is mentally incompetent. A defendant is mentally incompetent . . . if, as a result of mental disorder or developmental disability, he is unable to understand the nature of the proceedings taken against him and to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367.)

Section 1368 provides in relevant part: "(a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . .

"(b) If counsel informs the court that he believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Section 1368.1 and 1369. . . ."

Although the statute is written in terms which appear to give the trial judge broad discretion, case law has narrowed the range of his discretion to a great extent. ■ Thus, if a defendant presents *substantial evidence* of incompetency to stand trial, he has a constitutional right to a hearing on that issue, and the trial judge has *no discretion* to exercise. If, on the other hand, the evidence of present incompetency is *less than substantial,* whether to order a hearing is within the discretion of the trial judge. (*People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].)

"[T]he question as to what constitutes such substantial evidence in a proceeding under section 1368 'cannot be answered by a simple formula applicable to all situations.' " (*People* v. *Laudermilk* (1967) 67 Cal.2d 272, 283 [61 Cal.Rptr. 644, 431 P.2d 228], cert. den., 393 U.S. 861 [21 L.Ed.2d 128, 89 S.Ct. 139].) "[M]ore is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation]." (*Id.,* at p. 285.) A single doctor's report which concludes that defendant is incapable of standing trial, even in the face of other reports to the contrary, is substantial evidence requiring that a section 1368 proceeding be instituted. (*People* v. *Bute* (1969) 275 Cal.App.2d 143, 144-145 [79 Cal.Rptr. 721].)

However, it is not enough that an expert state that the defendant is mentally ill or insane to satisfy the substantial evidence test under consideration; the expert must state *"with particularity* that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, . . ." (*People* v. *Pennington, supra,* 66 Cal.2d 508, 519; italics added.)

■ At first glance it would appear that the testimony of Dr. Sutton would constitute substantial evidence of incompetency to stand trial thus requiring the trial court to conduct a hearing. However, defendant had a hearing prior to trial in which his competency to stand trial was litigated. The following statement from *People* v. *Melissakis* (1976) 56 Cal.App.3d 52, 62 [128 Cal.Rptr. 122], is pertinent to the instant case: "In reversing the judgment, we do not mean to suggest that the issue of present sanity cannot be resolved at a hearing prior to trial. Nor do we suggest that after a full pretrial hearing on the issue of present sanity the judge presiding at a defendant's trial may not rely at all upon a pretrial decision finding a defendant to be 'presently' sane in disposing of any subsequent motion for a further inquiry where the motion is not predicated upon a change of circumstances or new evidence. However, section 1368 of the Penal Code imposes upon the trial judge the duty, on his own motion, to inquire into the mental capacity of a defendant to stand trial whenever evidence presented during the trial *or prior to sentencing* raises a doubt in this respect. (*People* v. *Coogler* (1969) 71 Cal.2d 153, 168, fn. 7 [77 Cal.Rptr. 790, 454 P.2d 686]; *People* v. *Pennington, supra,* 66 Cal.2d 508, 520.) Consequently, a trial judge may not avoid his own responsibility to make proper inquiry regarding a defendant's capacity to stand trial or to understand the nature of the sentencing procedure by relying solely upon a pretrial decision or pretrial psychiatric reports where, during the trial or prior to the sentencing, he is presented with a substantial change of circumstances or with new evidence which casts a serious doubt upon the validity of the pretrial finding of present sanity. (Cf. *People* v. *Munoz* (1974) 41 Cal.App.3d 62, 66 [115 Cal.Rptr. 726]; *In re Miller* (1973) 33 Cal.App.3d 1005, 1021 [109 Cal.Rptr. 648]; *People* v. *Groce* (1971) 18 Cal.App.3d 292, 296-297 [95 Cal.Rptr. 688].)" The testimony of Dr. Sutton does not present "a change of circumstances or new evidence." Accordingly, the trial court could rely upon the pretrial decision finding defendant competent to stand trial.

3. *Should defendant's motion to quash the indictment have been ruled upon and granted by the trial court?*

On August 14, 1974, the Grand Jury of Marin County indicted defendant. In the course of pretrial proceedings, defendant's counsel filed a motion to quash the indictment which was later withdrawn at the request of defendant while he was representing himself. The motion was renewed in counsel's motion for a new trial.

On May 28, 1974, Dr. Leo Loughlin, the chief psychiatrist at San Quentin Prison, sent Josh Thomas, assistant district attorney of Marin County, a copy of a report based upon an interview conducted with the defendant on the date of the offense. Dr. Loughlin was of the opinion that defendant suffered from paranoid schizophrenia.

Defendant contends that the indictment should have been dismissed because the grand jury was not informed of this psychiatric diagnosis.

On September 19, 1975, the Supreme Court decided *Johnson* v. *Superior Court* (1975) 15 Cal.3d 248 [124 Cal.Rptr. 32, 539 P.2d 792], stating its holding as follows: "We hold, therefore, that when a district attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under section 939.7 [of the Penal Code] to inform the grand jury of its nature and existence, so that the grand jury may exercise its power under the statute to order the evidence produced." (*Id.*, at p. 255.) In *People* v. *McAlister* (1976) 54 Cal.App.3d 918 [126 Cal.Rptr. 881], certiorari denied, 429 U.S. 850 [50 L.Ed.2d 123, 97 S.Ct. 138], the court considered the issue of whether *Johnson* was to be given retroactive effect. The court stated: "based upon a consideration of all three criteria of *People* v. *Hitch, supra*, 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], we hold that the rule of *Johnson* v. *Superior Court* does not apply retroactively to grand jury proceedings antedating the decision." (*Id.*, at p. 926.) The court also noted that since there was "no law of the *Johnson* case in effect prior to September 19, 1975, law enforcement authorities were entitled to act in accordance with their practice preceding it; . . ." (*Id.*, at p. 926.) As the grand jury proceeding in the instant case antedated *Johnson*, defendant is not entitled to have his conviction reversed because the district attorney did not inform the grand jury of the psychiatric diagnosis.

### 4. *Was defendant prejudiced by being restrained during the trial?*

On the first day of trial the judge stated: "The record will show that we have discussed certain matters and there are certain things that we should take up. One thing that we discussed is the shackling of Mr. Zatko. Mr. Zatko objects to being shackled. The Court indicated that it was going to unshackle his hands and arms and was merely going to see that he was shackled to a chair in the courtroom. The reason for this is that Mr. Zatko has violence in his background, this being, for example, charge of violence. He also has a prior conviction wherein . . . he beat up an old man, . . ."

"Also that he has had to be put in the adjustment center at San Quentin on occasion and that the last time that he was in court he made a threat." At this point the trial judge asked the district attorney to repeat the threat and the district attorney stated defendant had said "we would see something that the Marin County Courthouse had never seen before." The court then ordered that defendant would be chained to the chair but his hands would be free and stated, "it has worked out very nicely and frankly, I think sometimes that the jury doesn't even notice that they are shackled to the chair." When defendant took the stand, he did so prior to the jury coming into the courtroom to avoid the jury seeing defendant chained to the witness stand.

Defendant states on appeal, "In spite of the absence of a showing of necessity by the prosecutor or the sheriff, the trial judge required him to remain shackled throughout the trial, even upon assuming the witness stand. Such ruling amounted to an abuse of judicial discretion and required reversal."

California has adhered to the rule that except in instances of necessity, a defendant has the right to appear in court before a jury free of restraints since 1871. (*People* v. *Harrington* (1871) 42 Cal. 165, 168.) Recently in *People* v. *Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322], the California Supreme Court once again articulated the reason for the rule as follows: "We believe that possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand, all support our continued adherence to the *Harrington* rule. We reaffirm the rule that a defendant cannot be subjected to physical restraints of any kind in the courtroom while *in the jury's presence,* unless

there is a showing of a manifest need for such restraints." (*Id.,* at pp. 290-291; italics added.)

The court in *Duran* further stated: "In the interest of minimizing the likelihood of courtroom violence or other disruption the trial court is vested, upon a proper showing, with discretion to order the physical restraint most suitable for a particular defendant in view of the attendant circumstances. The showing of nonconforming behavior in support of the court's determination to impose physical restraints must appear as a matter of record and, except where the defendant engages in threatening or violent conduct in the presence of the jurors, must otherwise be made out of the jury's presence. The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (At p. 291.)[5]

The Supreme Court pointed out in *Duran* that the trial judge must make the decision to use physical restraints on a case by case basis. ■ A general policy of imposing such restraints upon prison inmates will not be permitted. However, an accused may be restrained on a showing that he plans to disrupt proceedings by nonviolent means. "Evidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained may warrant the imposition of reasonable restraints if, in the sound discretion of the court, such restraints are necessary." (*People* v. *Duran, supra,* 16 Cal.3d 292-293, fn. 11.)

In light of the fact that defendant had made a threat of violence, it does not appear that the trial court abused its discretion. It should further be noted that the trial court attempted to use physical restraints that were as unobtrusive as possible. In fact, there is nothing in the record to indicate that the jury was even aware of the physical restraints. "It is elementary that the function of an appellate court, in reviewing a trial court judgment on direct appeal, is limited to a consideration of matters contained in the record of trial proceedings, and that 'Matters not presented by the record cannot be considered on the suggestion of counsel in the briefs.' " (*People* v. *Merriam* (1967) 66 Cal.2d 390, 396-397 [58 Cal.Rptr. 1, 426 P.2d 161],

---

[5]This part of *Duran* which holds that there must be a record showing the need for restraints enunciates a new rule of law. Therefore the requirement for a record is applicable only in cases wherein the trial court's ruling on questions of restraints was subsequent to February 27, 1976. In the instant case Honorable Judge Menary made his decision to shackle on January 21, 1976. (See *People* v. *Condley* (1977) 69 Cal.App.3d 999, 1007-1008 [138 Cal.Rptr. 515].)

overruled on other grounds in *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 882 [132 Cal.Rptr. 119, 538 P.2d 247].)

5. *Should the trial court have instructed the jury to disregard the restraints?* ·

Finally, defendant claims that the trial court should have, *sua sponte,* instructed the jury to disregard the restraints. "In those instances when visible restraints must be imposed the court shall instruct the jury *sua sponte* that such restraints should have no bearing on the determination of the defendant's guilt. However, when the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided." (*People* v. *Duran, supra,* 16 Cal.3d 282, 291-292.)

The trial court did not err in not giving such an instruction. In fact, it would have been error to have given such an instruction. The defendant was restrained in an unobtrusive manner so the jury would be unaware of the restraints. If the trial court had instructed the jury to disregard the restraints, this would have called to the attention of the jury the very thing that was trying to be avoided.

We affirm the judgment.

Taylor, P. J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 22, 1978.