[No. 11484-1-I.   Division One.   March 19, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN FREDERICK IMUS, *Appellant.*

---

*Elizabeth K. Selleck* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Marion Jamieson Mittet, Deputy,* for respondent.

DURHAM, C.J.—The defendant, John Frederick Imus, appeals the judgment and sentence entered on his conviction by a jury of rape in the first degree (RCW 9A.44.040) while armed with a deadly weapon (RCW 9.95.040) which was also a firearm (RCW 9.41.025). The single issue before us is if the trial court correctly granted Imus' request to discharge his attorney and to represent himself at trial. We

affirm.

Imus was arrested December 8, 1981, and charged with rape and kidnapping. Based on observations by his appointed counsel, Wayne Lieb, Imus was examined by a psychiatrist, Dr. Richard Jarvis, to evaluate his competency to stand trial. Dr. Jarvis reported that Imus had various adjustment problems and was a functional illiterate, having left school during the second grade, but concluded that Imus was competent to stand trial. On January 29, 1982, pursuant to an order of commitment, Imus was sent to Western State Hospital for further evaluation of his competence. Western State staff concluded that Imus, although of borderline intelligence, was not insane at the time of the alleged rape and was competent to stand trial. Following a hearing, the trial court entered an order on February 9, 1982, stating that Imus was competent to stand trial.

The same day, a hearing was held before Judge Dixon on a motion by Wayne Lieb to withdraw as counsel for Imus and on Imus' motion to proceed pro se. Judge Dixon questioned Imus about his decision to proceed pro se, and strenuously warned him against it. Following the hearing, Judge Dixon entered an order permitting Lieb to withdraw and Imus to represent himself, with the stipulation that Lieb would remain in a standby capacity.

Trial began before Judge Roberts 10 days later. Prior to the selection of the jury, Judge Roberts questioned Imus as to his choice to proceed pro se and warned him against it. Nevertheless, Imus proceeded to represent himself. The jury returned a verdict of guilty of rape in the first degree while armed with a deadly weapon and a firearm. The trial court appointed Lieb as standby counsel for purposes of posttrial motions, denied Imus' motion for judgment in arrest of verdict and for a new trial, and entered judgment and sentence on the jury verdict.

On appeal, Imus contends that the trial court erred by permitting him to proceed pro se without first ascertaining that he had made a knowing and intelligent waiver of his right to counsel. He argues: (1) that the trial court failed to

fully inform him of the nature and consequences of the charges against him, (2) that he was incompetent to waive his right to counsel due to his illiteracy, and (3) that he had never unequivocally asked to proceed pro se in the first place. We shall discuss these contentions in order.

## TRIAL COURT'S DUTY TO INFORM

A defendant who is mentally competent has the right to conduct his defense in person, without the assistance of counsel. *Faretta v. California,* 422 U.S. 806, 821, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975); Const. art. 1, § 22 (amend. 10). To exercise the right of self–representation, a defendant must be found to have validly waived his right to counsel. A valid waiver of counsel not only must be voluntary, but also knowing and intelligent. *Faretta,* 422 U.S. at 835.[1] The validity of a defendant's waiver of counsel is an issue which depends upon the particular facts and circumstances of each case. *See Johnson v. Zerbst,* 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 A.L.R. 357 (1938).

> Imus argues that the court erred by not informing him of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charge, and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

Brief of Appellant, at 8, quoting *Von Moltke v. Gillies,* 332 U.S. 708, 724, 92 L. Ed. 309, 68 S. Ct. 316 (1948). He claims that the failure to inform him of each of these facts prevented his waiver of counsel from being knowing and intelligent. We disagree. The United States Supreme Court has made it clear that a defendant does not need to be informed of technical legal matters to validly waive counsel. The central concern is that the defendant generally understand the import of his decision to proceed pro se:

---

[1]*Faretta v. California,* 422 U.S. 806, 835, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975) adopted the definition of "waiver" as stated in *Johnson v. Zerbst,* 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 A.L.R. 357 (1938): "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege."

Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self–representation, *he should be made aware of the dangers and disadvantages of self–representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."*

(Italics ours.) *Faretta,* 422 U.S. at 835.

A review of the record in this case convinces us that, under the *Faretta* standard, Imus' waiver of counsel was knowing and intelligent. Despite strenuously repeated warnings by Judge Dixon, Imus was emphatic about his desire to proceed pro se:

THE COURT: You want to represent yourself?

THE DEFENDANT: You bet.

THE COURT: Why?

THE DEFENDANT: Wayne Lieb is a good attorney, one of the best, but he don't believe I'm innocent and I feel a man that don't believe I'm innocent don't have any right representing me. I can address the Court and show you why, if you don't mind.

. . .

THE COURT: Okay, the concluding line [of Western State's evaluation] is, since our evaluation is complete, Mr. Imus is competent. We request that he be returned to Court for further proceeding.

Have you ever been in Court before in a trial?

THE DEFENDANT: Yes, I did—I represented myself right here and this is what the judge gave me at the time. Here is a copy of it. It was over changing the visiting rights on my two minor children. Your Honor, I represented myself on that matter.

THE COURT: That was in April of this year or last year rather.

. . .

THE COURT: You want to represent yourself? Do you understand the Rules of Evidence?

THE DEFENDANT: I understand the best thing in my behalf, that I'm not guilty, that is the biggest thing in my favor. That's the biggest thing in my favor.

THE COURT: A lot of not guilty people have been convicted.

THE DEFENDANT: I can appreciate that, your Honor.

. . .

THE COURT: I'm going to let you represent yourself. I think you are making a big, big mistake representing yourself. I think you are substantially increasing the likelihood you will be convicted and I'm saying these things on the record now because if you are convicted and if you are sent to the penitentiary, I don't want to see any writs floating over here saying you were denied your rights to representation; it is against the expressed advise [sic] of the Court you are going to represent yourself.

THE DEFENDANT: I understand that, your Honor.

THE COURT: The Rules of Evidence that [sic] the trial will be observed, if you ask for information from a witness and it's objectionable, the judge will sustain the objection, he will afford you no extra consideration because you are representing yourself. He will expect exactly the same sort of thing out of you that he will expect from an attorney. He will sustain proper objections to leading questions, he will not let you say come in [sic], he will not let you call the prosecuting attorney a liar. You will not be able to put this man on trial, that's what I'm saying, all of those things apply, all of the rules will be observed.

THE DEFENDANT: Your Honor, have you ever read her statement?

THE COURT: No, I have no reason to read her statement at this hearing. You see, that's what I'm talking about, you don't know what you are doing, you are in a courtroom, you are out of your element. You think I should read statements from some girl at a hearing to determine whether or not you ought to be able to discharge your attorney. That has nothing to do with it, you don't understand it. If I discharge your attorney, he is going to be out, you will not be afforded a continuance of the trial date.

THE DEFENDANT: That's fine, your Honor.

THE COURT: The case will go to trial on the date that it's now set. I again, I would express to you as strenuously as I can, you are probably making the biggest mistake of your life and one that may result in your being confined in the penitentiary of this State for, what's the maximum on this?

MR. LOBSENZ: Life.

THE DEFENDANT: Life.

THE COURT: Life in the penal institution.

THE DEFENDANT: I understand. For the Court's information, I'm not guilty and that's in my favor.

THE COURT: That has nothing to do with whether or not you should be represented by an attorney. If you are not guilty, that is even more reason for you to be represented by an attorney.

MR. LOBSENZ: Your Honor, I was wondering if I could put a few things on the record.

THE COURT: You bet.

MR. LOBSENZ: The State's position is that Mr. Imus has a right to represent himself and I don't oppose the Court's granting the motion, although I have reviewed the law and I have reviewed what is set forth in *State vs. Watkins* [25 Wn. App. 358, 606 P.2d 1237 (1980)]. It sets forth eight principles that the Court's to be guided by. The only one that I think is at all troublesome is obviously the waiver must be knowingly and intelligent. I think your Honor has done more than—

THE COURT: You better go through the other part of it.

MR. LOBSENZ: The other principles say there is a constitutional right to self–representation. The defendant must request it himself; it must be unequivocal; must be timely made, cannot be used to delay or obstruct trial; does not excuse procedural law, and all of those are satisfied in my opinion at this point, although I would ask the Court to do a number of things. Notice that stand–by counsel can be appointed over the defendant's objection to stand by in case he changes his mind during trial, in case during trial he wants the advice of an attorney on one specific point or in case the trial judge decides he can no longer represent himself and a lawyer will be appointed.

THE COURT: I will ask Mr. Lieb to stand by, but he will not participate unless specifically requested.

On the day of trial, Judge Roberts restated these warnings, after an extensive attempt to discern Imus' true intent, to be discussed *infra*:

THE COURT: Just a minute, sir. Before Judge Dixon, according to the prosecuting attorney's brief, Judge Dixon said he—well, he advised the Defendant Imus, the Court believed Imus was making a very big mistake in

representing himself. Quite frankly, I would share that opinion.

I will just say this: I am not trying to convince you one way or the other. You have an absolute constitutional right to represent yourself, and Judge Dixon honored that right. I will honor that right, but I just want to make sure that that is your decision, and I am not trying to convince you one way or the other.

There is an old adage in the law, you know, a person who represents himself has a fool for a client.

MR. IMUS: I know it, your Honor.

THE COURT: I have already told you, I spent eighteen years as a trial lawyer, and I have spent over twelve years on this bench. If I were accused of a crime, there is no way I would ever try to represent myself even though I think I was a pretty darned good trial lawyer in my day.

If you want that right—and it is a right to you—or if you want Mr. Lieb to represent you, this is the question we first have to ascertain, and only you can make that decision. What is your decision?

MR. IMUS: About him representing me?

THE COURT: That's right.

MR. IMUS: No, your Honor.

The record is clear that both judges believed that Imus was competent to waive his right to counsel:

[Judge Dixon] You look fine to me, you seem to be an individual about to make a big mistake but you seem fine from a mental point of view.

[Judge Roberts] You have gone into this with your eyes wide open. You have made the decision. I will, again, extend to you the right to change your opinion as to whether or not you represent yourself, but you cannot have it both ways.

We conclude that the facts of this case comport with the standards laid down in *Faretta*. Imus was informed that his conviction could lead to life in prison. He was repeatedly and strenuously warned of the danger and disadvantages of self–representation. Judge Roberts also offered to let Imus reconsider his decision at any time during the trial. Despite these warnings, Imus proceeded pro se. Given the lengthy colloquy below, we fail to see how information concerning lesser included offenses, the range of allowable punishments

thereunder, or possible defenses and mitigating factors, would have made Imus' decision more knowing and intelligent in any significant sense.[2]

## EFFECT OF ILLITERACY

■ Imus next argues that his ability to waive counsel was impaired by the fact that he was of borderline intelligence and a functional illiterate. We agree that, in some cases, a defendant's level of intelligence and literacy may reflect his ability to understand the import of his decision to proceed pro se. Nevertheless, these factors do not automatically preclude a defendant from being allowed to exercise his right of self–representation. So long as the defendant is made aware of the dangers and disadvantages of self–representation, and the record reflects that "'he knows what he is doing and his choice is made with eyes open", the court cannot deny the defendant's request to proceed pro se. *Faretta*, 422 U.S. at 835, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 87 L. Ed. 268, 63 S. Ct. 236, .143 A.L.R. 435 (1942). A defendant's illiteracy seems more likely to impair his ability to wage a competent defense than to affect his initial decision to waive counsel.[3] It is clear, however, that a defendant's competency to wage an effective pro se defense is a separate matter from his competency to waive his right to counsel:[4]

---

[2]Imus cites the procedures for waiver of counsel set forth in Justice Black's plurality opinion in *Von Moltke v. Gillies*, 332 U.S. 708, 92 L. Ed. 309, 68 S. Ct. 316 (1948). We note that the petitioner's waiver of counsel in *Von Moltke* was accompanied by a plea of guilty. *Von Moltke*, 332 U.S. at 709. Justice Black's opinion appears to merge the procedures for waiving counsel with those for pleading guilty. *See* CrR 4.2(d).

[3]In view of this fact, the trial court allowed a standby attorney to sit with Imus through the trial. Imus also had the opportunity to consult with counsel before his decision to proceed pro se.

[4]A defendant's competency to waive counsel is also a separate matter from his competency to stand trial. *See Westbrook v. Arizona*, 384 U.S. 150, 16 L. Ed. 2d 429, 86 S. Ct. 1320 (1966) (finding of competency to stand trial is not dispositive of issue of competency to waive counsel).

> We need make no assessment of how well or poorly [the defendant] had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on *voir dire. For [the defendant's] technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.*

(Footnote omitted. Italics ours.) *Faretta,* 422 U.S. at 836. *Accord, State v. Fritz,* 21 Wn. App. 354, 360, 585 P.2d 173, 98 A.L.R.3d 1 (1978).

Both judges below knew of Imus' inability to read, yet found that he understood what he was doing when he waived counsel. We cannot disagree with this finding, given the numerous exchanges on the record in which Imus appears fully aware of the import of his decision to represent himself.[5]

## UNEQUIVOCAL REQUEST

■ Finally, Imus argues that his request to proceed pro se was not stated unequivocally, and that the trial judge improperly assumed that Imus wished to waive the assistance of counsel. The requirement that a request to proceed pro se be stated unequivocally derives from the fact that there is a conflict between a defendant's rights to counsel and to self-representation. Because of this conflict, a defendant's request for self-representation can be a "heads I win, tails you lose" proposition for a trial court. *People v. Sharp,* 7 Cal. 3d 448, 462 n.12, 499 P.2d 489, 103 Cal. Rptr. 233, 242 (1972), *cert. denied,* 410 U.S. 944 (1973). If the court too readily accedes to the request, an appellate court may reverse, finding an ineffective waiver of the right to counsel. But if the trial court rejects the request, it runs the risk of depriving the defendant of his right to self-representation. *People v. Sharp, supra.* To limit baseless challenges on appeal, courts have required that a defendant's

---

[5]For example, during trial, Imus stated:

"This is why I am representing myself, [to be allowed to make an opening statement] because I do want to exercise my right to represent myself. After all, I am the one that is going to go to prison for the rest of my life."

request to proceed pro se be stated unequivocally.[6] *Chapman v. United States*, 553 F.2d 886, 892–93 (5th Cir. 1977). *Accord, State v. Fritz, supra* at 360.

Imus argues that his request below was not to represent himself, but to have the court appoint new counsel. However, a careful reading of the record reveals that this was not the case. Imus numerous times stated unequivocally his desire to represent himself and his reasons for wanting to do so. The matter first arose before Judge Dixon on February 9, 1982, at a hearing on Imus' motion to discharge his attorney and to represent himself. The court's first question to Imus was: "You want to represent yourself?", to which Imus replied, "You bet." Later, Imus requested a copy of the order allowing him to represent himself. He also objected to the court's order that his attorney remain as standby counsel, and requested the appointment of new counsel for that purpose. The court denied the request.

On the day of Imus' trial, the matter of self–representation came up again. Judge Roberts took great care to insure that Imus' desire to proceed pro se was stated clearly for the record. Imus' ultimate response was unequivocal:

> THE COURT: Well, this case is called for trial right now, sir, and the first question, and I will repeat it for the third or fourth time is, do you wish to be represented by Mr. Lieb or do you wish to represent yourself pursuant to the order previously entered in this cause by Judge Dixon?
>
> MR. IMUS: Well, two things, sir, your Honor: I have never been able to talk up for myself around this whole situation ever. In talking to the prosecuting attorney's office, if we could have talked, this thing probably never would have went to jury trial.
>
> I do want to represent myself because then I can speak for myself, and I know myself and can speak the right way. I am not going to be wrong, just like I want a motion today for a PR, and I can tell you why.
>
> THE COURT: So, you wish to represent yourself?

---

[6]*See, e.g., Meeks v. Craven*, 482 F.2d 465, 467–68 (9th Cir. 1973) (defendant's statement "I think I will" held to be an equivocal request to proceed pro se).

MR. IMUS: That's right.

THE COURT: All right. Now, we passed that point.

We are convinced that Imus' request to represent himself was unequivocal, and that the trial court properly granted the request.

The judges below went to great length to determine Imus' intent regarding self–representation, and, then, to warn him of the consequences of his decision. In these circumstances, a finding of error by this court would place the trial court in the position of committing reversible error regardless of which way it ruled. We decline to so hold.

The judgment is affirmed.

WILLIAMS, J., concurs.

RINGOLD, J. (dissenting)—My dissenting opinion is not meant to reflect any criticism of the experienced and careful trial judges who ruled on this difficult issue. We are here confronted with two apparently conflicting rights emanating from the right to counsel guaranteed to an accused by the United States Constitution and the Washington State Constitution. Like so many issues in criminal law, this is a changing area in which courts are considering new issues, standards, and criteria affecting the entire system of justice. Until *Faretta v. California,* 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975) was decided, there was no authoritative rule that self–representation is a constitutional right implied from the accused's right to counsel. Standards are still being formulated by which a proper balance may be devised and followed by the courts.

There are two problems with the majority opinion. First, the majority's conclusion that Imus' request to proceed pro se was stated unequivocally, is nothing more than that: a conclusion without discussion of the contradictory statements made by Imus. Second, I believe the trial judges overlooked essential factors which must be considered to find a knowing and voluntary waiver of the right to counsel.

## UNEQUIVOCAL WAIVER

Proper consideration of this issue requires that the colloquy surrounding the grant of Imus' motion to represent himself at trial, and not reviewed in the majority opinion, be set out.

Judge Roberts questioned Imus before trial. The following supplements the excerpts in the majority opinion at pages 176–77.

THE COURT: You want to represent yourself?

MR. IMUS: No, I want him [Mr. Lieb] to be beside me in the courtroom.

THE COURT: Well, we haven't reached that point. You have got to make the decision. Do you want to represent yourself or do you want to be represented by Mr. Lieb? You can't have it both ways.

MR. IMUS: Well, an attorney has got a way to put a victim down, in my defense, got a way to put him down. I went through divorce court. I know there is no connection, but I just want to say something to your Honor, please.

I went through divorce court, and somebody said I had a problem, so I went to an out–patient clinic for a couple of different visits, and I built up a really good case against my wife, and I had my children won in court, and when I took the stand, I couldn't stand the way the attorney that represented me put her down, and I said, "She is a wonderful mother. She is a good cook." When I got done, the judge give her the kids.

See, I am not that way, your Honor. I am not that way. I am not going to do that to somebody. I am not going to put this victim down like that. I am not going to allow my attorney to put her down like that.

THE COURT: Do you have any idea, Mr. Lieb, of putting her down?

MR. LIEB: No, your Honor, I would never needlessly embarrass a witness.

THE COURT: Again, I repeat the question—

MR. IMUS: Now, this is—

THE COURT: Now, just a minute, sir. Do you wish to represent yourself or do you wish to be represented by Mr. Lieb? Now, that is the first question we have to answer.

MR. IMUS: Well, Mr. Lieb, in the past, I went for a PR,

and I am asking for that today too. There are things that people said that wasn't true. The prosecuting attorney made a couple statements that wasn't true.

One, the lady prosecuting attorney made a statement, "Well, he put a loaded gun to the woman." Well, if I did or didn't, whatever, the gun was not loaded. That was one thing that was a lie, and then he said I had at numerous times seen a mental health counsellor and been in and out of the hospital. There is no proof of that, and it is not true.

So, things like that come up against me, and then Mr. Lake was partly representing me when I went for a PR.

I did undercover work for the FBI, and I looked like a transient. If I want to get evidence against somebody, I can't go up there like a bigshot. I have got to go there like a bum, like a transient, like somebody that don't know anything, like a dumb person, to try to get things. I worked off and on for the FBI and ATF for a number of years, FBI for eleven months now, and so it can't come in in my trial, they said.

THE COURT: I repeat my question, sir: Do you wish to be represented by Mr. Lieb or do you wish to be your own counsel?

MR. IMUS: Can I ask your Honor one question, please?

THE COURT: Yes.

MR. IMUS: I would like this to go on the record or whatever. I think maybe at the last minute now, I don't want a continuance, but at the last minute, if another attorney comes off the street, I have some relations, if somebody comes off the street and wants to represent me and I want to let them take it over at the jury trial, am I allowed to do that? I don't see why not.

THE COURT: Well, this case is called for trial right now, sir, and the first question and I will repeat it for the third or fourth time is, do you wish to be represented by Mr. Lieb or do you wish to represent yourself pursuant to the order previously entered in this cause by Judge Dixon?

MR. IMUS: Well, two things, sir, your Honor; I have never been able to talk up for myself around this whole situation ever. In talking to the prosecuting attorney's office, if we could have talked, this thing probably never would have went to jury trial.

I do want to represent myself because then I can speak for myself, and I know myself and can speak the right

way. I am not going to be wrong, just like I want a motion today for a PR, and I can tell you why.

THE COURT: So, you wish to represent yourself?

MR. IMUS: That's right.

THE COURT: All right. Now, we passed that point. Now, as I understand, although it is not clear from Judge Dixon's order, that in the State's trial memorandum, it states, in addition, that Judge Dixon directed that Mr. Lieb not sit at counsel table and should not be identified in any way to the jury.

Now, that is not as I read the order; that is not in the order. Is that the situation?

. . .

THE COURT: It is not in Judge Dixon's order, so that is now before me. I am the trial judge. As I have indicated before—and I have read State vs. Fritz very carefully, and all of the other cases—and as I indicated, I think, and tried to ascertain from Mr. Lieb, because there was some doubt in the Court's mind as to what his desires were, that he could not have it both ways.

In short, he either represents himself pursuant to Judge Dixon's order—I will give him the right to change his mind—but he can't have it both ways. He cannot be pro se or acting as his own attorney, which he has a constitutional right to do, and, at the same time, have counsel seated by him.

I will direct that Mr. Lieb remain in attendance throughout the trial; that he not sit at counsel table; that he be available to the defendant, provided it is consistent with the proper jail authorities and their rules and regulations, to consult during recess, and at such time as I find that the defendant, acting as his own attorney, in any way affects the orderly administration of justice or the orderly presentation of the case, that I will reserve to myself, the right, even over the defendant's objection, to direct Mr. Lieb to step in and to act as the defendant's counsel.

Now, Mr. Lieb, I will give you the opportunity, because this is the last time that you are going to act as counsel, to make any comments or urge me to reconsider my ruling.

MR. LIEB: Thank you, your Honor, and I apologize for interrupting the Court, but there were a couple of things I don't think the Court was aware of.

. . .

The second problem is that I have been—I have done the large majority of investigation work in this case, and, of course, Mr. Imus has been incarcerated through the time, and so I think in fairness to him, along with the consistent rule that your investigator is allowed to be with you during the trial, I should be allowed to sit and consult with him regarding the investigation.

. . . I think as a practical matter, I can assist him in obeying the Court's order by merely assisting his understanding of the parameters of, for example, rules of evidence.

There is a fourth reason which is that Mr. Imus is basically unable to read. He reads at an extremely limited level. So for all intents and purposes, he cannot read. Just this afternoon, Mr. Lobsenz served on us approximately, oh, thirty or forty pages of memorandum, and Mr. Imus needs someone who can read it and interpret it for him, read it to him so that he can understand it, and so he does need someone beside him just to do the reading.

I would not intend to speak except in a client tone to Mr. Imus, in the proceedings, unless directed to do so by the Court, and, of course, Mr. Imus.

I would require the permission of both, I think, before I could participate, but I think that there are both procedural reasons that would basically allow this case to flow more smoothly if I were allowed to be here, and also I do think that Mr. Imus simply has the right to have the person who has acted as the investigator with him in the court to assist in that.

Frankly, I have talked with all of the witnesses that I thought would be helpful to talk to, and he has not had that opportunity, so, in good faith, I do believe that there is a reason I should be able to assist him in that regard.

THE COURT: Well, let's make it clear. I have never, as long as I have been on this bench, and I cannot see that I ever would, permit a non lawyer investigator to sit at counsel table, never. Now, if you wish to be in attendance in your role as investigator, then you will have to sit in the spectator seats.

Now, as I say, I don't think the defendant can have it both ways. He either acts as his own attorney—and I think that regardless of what Judge Dixon ruled, it is my

ruling that if the defendant—and I will continue prior to the time that we start jury selection and give the defendant the right to change his mind. But, once this jury selection is started, I am going to advise the jury that in the event the defendant doesn't change his mind, that the defendant, by an order entered by another judge of this court, is acting as his own counsel, and he will do that. And you may—in fact, you will stay in attendance for the reasons previously stated to, number one, that if I find that the defendant is representing himself adversely as it affects the orderly administration of justice, then I reserve to myself the prerogative of saying, even over the defendant's objections, that you will now represent him as his attorney.

But he can't have it both ways. No defendant can have it both ways. He either acts as his own counsel or he doesn't.

[Court rules that Mr. Lieb can sit at counsel table with Imus, and that Imus is precluded from questioning the victim as to her past sexual history.]

. . .

. . . I might say this as a general statement for the education of the prosecuting attorney and everybody: I take the position and I always have that when a person elects his constitutional rights to act as his own counsel, and we spent a lot of time this morning, that he does just that. He gets no special favors from this court. He is required to properly conduct himself. I am not going to try his case for him, and I am not going to explain everything else.

In other words, you are acting as your own attorney, and you are going to go into this with that understanding.

. . .

Any other prior proceedings?

MR. IMUS: Yes, I would like to—

MR. LOBSENZ: No.

MR. IMUS: I would like to have a tape recorder brought to that jury trial because of my reading ability and stuff, because I can't take shorthand. I can't even take regular writing. I need a tape recorder to tape what is being said at the trial for my own benefit, not as evidence in court, but for my own benefit. Because of the federal law, you cannot tape people without their knowledge.

THE COURT: The motion to have a tape recorder present will be denied.

. . .

THE COURT: The motion for the defendant to be released on his personal recognizance will be denied. Any other prior motions?

MR. IMUS: Your Honor—

THE COURT: Yes.

MR. IMUS: I don't really think it is fair that you hear me because I would be able to represent myself at the time, and I can see why it was denied because I didn't have a right in my defense to show why I should be released, and I think I should have that right to exercise that right right now, your Honor.

THE COURT: You have, and I have denied your motion.

MR. IMUS: I haven't even spoken, and you denied it.

THE COURT: Well, you have too. I heard you. But proceed. Are there any other motions?

. . .

MR. IMUS: . . . I want to exercise my rights, your Honor, and these should be my rights.

Because I am defending myself, I should have the right to attack him by anything he said against me at the time to get my PR denied or my bail down to thirty–five hundred or something moneywise. I should have that right.

THE COURT: You have gone into this with your eyes wide open. You have made the decision. I will, again, extend to you the right to change your opinion [sic] as to whether or not you represent yourself, but you cannot have it both ways. The motions will be denied.

. . .

MR. IMUS: If I could make bail, this thing could be continued if I could make bail on the outside, and then could even have this attorney if I was on the outside, but I want to be able to do the foot work for my attorney if he was going to be my attorney at the jury trial, but as it is, if I am going to be kept in custody and everything is going to be pushed at me like this, no, I am going to be my own attorney.

I realize I have a fool for a client. I am not being disrespectful to this court or disrespectful to this man's hard work as an attorney. I know I am absolutely not guilty. This man does not believe that I am not guilty, so I don't want him to represent me, period, and I think you

can understand my feelings, your Honor. I am sure you can, really.

. . .

[jury voir dire and jury empaneled]

. . .

THE COURT: Mr. Imus, I will say this to you and I invite you to think about it over the weekend. Quite frankly, in your handling of the voir dire examination, you did a very fine professional job. Your questions were good. They were to the point. You have done a good job, but one of the big problems that you are going to have, in the event that you decide to testify, I can't just let you ramble on and on like you have been doing here.

MR. IMUS: I know it.

THE COURT: And you have got a very big problem that I seriously urge you to consider over the weekend as to whether or not you continue to wish to represent yourself. As I said before, as long as you express that wish, and in view of Judge Dixon's order, I will honor it, but, on the other hand, at any time that you change your mind and reconsider and tell me that you wish Mr. Lieb to represent you, I will honor that request.

I seriously urge you to think long and hard, if, for no other reason, as to how you are going to present your testimony in the event, of course, you decide to testify, without anybody putting the questions to you. That is an extremely difficult position.

As I told you before, I was considered to be a fair to middling trial attorney for eighteen years, and I wouldn't know how to do it if I were in your position, and if you are better than I am, so be it.

MR. IMUS: No, I am not.

. . . I won my divorce case.

The attorney I had representing, I did the leg work for him, but the attorney represented me and I had the kids won. He told me, "You should never have hired me because you got up on the witness stand and you give your kids to your ex–wife with you getting up on the witness stand and sticking up for her like that." And I said, "I didn't want you putting her down."

This record establishes that Imus made contradictory statements about his desire to represent himself, and

demonstrates the difficulties Imus faced in acting pro se. At the close of the court session, just before recess, Imus stated to the court, "I was thinking about Dr. Jarvis and I was really—why I was hesitating, I was thinking about Wayne taking over. That is what I was discussing. I'm not an attorney." The next morning Imus stated to the court, "I'm really ashamed of myself, that Wayne didn't take the whole ball from the start. But it is a little late for that."

As the majority states, the right of a criminal defendant to represent himself in court is guaranteed by article 1, section 22 of our state constitution: "In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel . . ." It is also necessarily implied by the structure of the sixth amendment to the United States Constitution. *Faretta v. California,* 422 U.S. 806, 819, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). Respect for the assertion of this right must, however, be tempered by concern for the many other important rights which a defendant waives by choosing self–representation.

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. *Johnson* v. *Zerbst,* [304 U.S. 458, 464–65, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 A.L.R. 357 (1938)]. Cf. *Von Moltke* v. *Gillies,* 332 U. S. 708, 723–724 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self–representation, he should be made aware of the dangers and disadvantages of self–representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams* v. *United States ex rel. McCann,* [317 U.S. 269, 279, 87 L. Ed. 268, 63 S. Ct. 236, 143 A.L.R. 435 (1942)].

*Faretta v. California, supra* at 835.

In holding that Faretta should have been allowed to proceed pro se, the Court considered the following as important factors:

Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the "ground rules" of trial procedure.

*Faretta,* at 835–36.

Although not made express requirements for waiving the right to counsel and proceeding pro se, the factors considered by the Court in *Faretta* have generally established the parameters for reviewing on appeal a waiver of the right to counsel. To "knowingly and intelligently" waive counsel and exercise the right to proceed pro se, a defendant must unequivocally demand to be allowed to proceed pro se. *State v. Fritz,* 21 Wn. App. 354, 585 P.2d 173, 98 A.L.R.3d 1 (1978). "Statements of desire not to be represented by a court appointed attorney do not express an intent to represent oneself without counsel. . . . Nor do these statements constitute the necessary unequivocal request for self–representation." *State v. Garcia,* 92 Wn.2d 647, 655, 600 P.2d 1010 (1979). I cannot find in the record before us an unequivocal request to proceed to trial without counsel and a knowing and voluntary waiver of the right to the assistance of a lawyer.

## ILLITERACY

A defendant must also be competent to make a valid waiver:

Even though a defendant demands his constitutional right to act as his own counsel, if the court determines that he does not have the requisite mental competency to intelligently waive the services of counsel nor adequate mental competency to act as his own counsel, then his right to a fair trial and his constitutional right to due process of law, is disregarded if the court permits him to so act in a criminal case.

*State v. Kolocotronis,* 73 Wn.2d 92, 99, 436 P.2d 774

(1968); *see also State v. Jones,* 99 Wn.2d 735, 664 P.2d 1216 (1983).

Where, however, a defendant, like Faretta, is "literate, competent, and understanding" and has been warned by the trial court of the dangers of self–representation, courts have generally sustained a decision by the trial court to allow the defendant to proceed pro se, and reversed decisions disallowing self–representation.

In *State v. Thacker,* 301 N.C. 348, 271 S.E.2d 252 (1980), the North Carolina Supreme Court held that the trial court had correctly granted the defendant's request to proceed pro se. The court stated the requirements of *Faretta* as follows:

> [T]he waiver of counsel, like the waiver of all constitutional rights, must be knowing and voluntary, and the record must show that the defendant was literate and competent, that he understood the consequences of his waiver, and that, in waiving his right, he was voluntarily exercising his own free will.

*Thacker,* at 354. To the same effect is *Pickens v. State,* 96 Wis. 2d 549, 568–70, 292 N.W.2d 601, 611–12 (1980), where the court said:

> When a defendant expresses a desire to proceed *pro se,* the trial court should examine him on the record to determine not only whether his waiver of counsel is knowing and voluntary, but also to determine whether he possesses the minimal competence necessary to conduct his own defense. Factors to consider in making this second determination include the defendant's education, literacy, fluency in English, and any physical or psychological disability which may significantly affect his ability to communicate a possible defense to the jury. However, since *Faretta* indicates that persons of average ability and intelligence are entitled to represent themselves, a timely and proper request should be denied only where a specific problem or disability can be identified which may prevent a meaningful defense from being offered, should one exist.
>
> . . .
> . . . We are convinced from our reading of the record that the defendant possessed more than the minimal

competence necessary to conduct his own defense. The record reveals that he is literate and, even though he had not graduated from high school, he had studied informally at a nearby university with several of his friends. The defendant claimed that he had also studied law informally with several lawyer friends and a law student roommate. His verbal skills and intellectual ability were certainly adequate, under the rationale of *Faretta,* to permit him to exercise his right of self–representation.

The Minnesota Supreme Court reversed a conviction because the record failed to support a finding of knowing and voluntary waiver of the right to counsel, stating:

> At the time petitioner's plea was accepted, the court apparently was unaware of any facts which would cast doubt on petitioner's capacity to make an intelligent decision whether to waive counsel. However, the presentence investigation report that the court received revealed that petitioner, who was 18 years old, had only a tenth grade education and that his scores on I. Q. tests were consistently low (79 in 1963, 69 in 1966, and 65 in 1970), suggesting strongly that petitioner was of considerably lower than average intelligence. In retrospect, we believe that after reading this report the court should have reopened the matter for the purpose of making a more detailed inquiry into petitioner's capacity to intelligently waive counsel. . . . The record, viewed as a whole, inadequately demonstrates that petitioner's waiver was knowing and intelligent, and, accordingly, we must reverse the order denying postconviction relief.

*Burt v. State,* 256 N.W.2d 633, 635–36 (Minn. 1977).

The Louisiana Supreme Court reversed a burglary conviction because "the trial judge did not adduce enough information from the defendant to determine whether he knowingly and intelligently waived his right to counsel." *State v. Bell,* 381 So. 2d 393, 394 (La. 1980). The court continued, at page 395:

> In upholding Faretta's right to represent himself, the high court noted that the record did affirmatively show "that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." . . .

Regardless of the basis for the judge's decision, the

record reflects no attempt on his part to assess the defendant's literacy, competency, understanding, and volition. We can only conclude that the judge did not investigate these factors and that his decision to allow the defendant to represent himself was not supported by the record of the hearing.

These cases stand for the proposition that the record must affirmatively show the defendant's literacy, competency, and understanding in order to find a knowing and intelligent waiver. I do not urge a per se rule that an illiterate person cannot meet the standards for a knowing and intelligent waiver. Case law establishes, however, that "[t]he judge must make a penetrating and comprehensive examination in order to properly assess that the waiver was made knowingly and intelligently." *State v. Chavis,* 31 Wn. App. 784, 790, 644 P.2d 1202 (1982); *see also State v. Dougherty,* 33 Wn. App. 466, 469, 655 P.2d 1187 (1982).

Regardless of whether an illiterate person is absolutely barred from waiving counsel, literacy is an important factor which must be considered by the trial judge in deciding whether to allow a defendant to proceed pro se. The majority separates competency to wage a defense and waiver of counsel, citing *Faretta,* at 836, for the proposition that "technical legal knowledge, as such, was not relevant to an assessment of [the] knowing exercise of the right to defend [oneself]." Mastery of the rules of evidence and courtroom procedure is a far cry, however, from the basic literacy necessary to read relevant documents, take notes during trial, and generally to function in the courtroom. *Faretta* cannot be stretched to state that illiteracy is not relevant to a determination of knowing waiver.

The record must reflect consideration of the effect of illiteracy. Here Judge Dixon was put on notice, both by the competency evaluation and by the prosecuting attorney, that Imus was not literate, but did not inquire of Imus concerning his illiteracy. At trial, in view of his inability to make notes, Imus requested permission to use a tape recorder. Without inquiring as to his illiteracy, Judge Rob-

erts denied the request.

In addition to their failure to inquire into the literacy question, the trial judges did not pursue Imus' statement that he had previously represented himself in a divorce case. Without inquiring further, Judge Dixon might have counted this alleged prior self–representation as a factor in granting the motion to proceed pro se. The record makes clear, however, that when Imus said he had represented himself in his divorce, he actually meant that his lawyer had called him as a witness to testify. See trial record *ante.*

Both judges asked whether Imus wanted to represent himself, and they warned him that he was making a mistake, but neither attempted to establish on the record whether he possessed "the minimal competence necessary to conduct his own defense." *Pickens v. State,* at 569. The trial court's warnings and the defendant's wishes must be viewed against the background of the defendant's ability to make a knowing and intelligent waiver. Both judges in effect subordinated consideration of Imus' ability to make a knowing and intelligent waiver to concentrating on allowing Imus to decide the issue himself.[7]

*Faretta* and its progeny make clear that though a defendant need not have specific legal knowledge in order to be judged competent to represent himself, he or she must be more than merely competent to stand trial. The trial court must ensure that the record shows a knowing and intelligent waiver of the right to counsel. As this court stated:

> An accused should not be deemed to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry into the accused's comprehension of the offer and capacity to make the choice intelligently and understandably has

---

[7]In contrast with the courts' solicitude for Imus' desires is the denial by the trial court of Imus' request for use of a tape recorder at trial in lieu of taking notes. This denial certainly raises a question as to whether he was denied his "right to a fair trial and his constitutional right to due process of law". *See State v. Kolocotronis,* 73 Wn.2d 92, 99, 436 P.2d 774 (1968).

been made. In *Von Moltke v. Gillies,* 332 U.S. 708, 92 L. Ed. 309, 68 S. Ct. 316 (1948), the plurality opinion stated at pages 723–24:

"The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—*whose life or liberty is at stake*—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, *a judge must investigate as long and as thoroughly as the circumstances of the case before him demand.* The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid *such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof,* and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made *only from a penetrating and comprehensive examination of all the circumstances* under which such a plea is tendered.

*State v. Chavis, supra* at 789.

The record fails to show an intelligent and competent waiver by Imus of his right to counsel. The trial judges did not adequately inquire into Imus' competence to waive counsel and proceed pro se, and did not ascertain that he had been informed of the nature of the charges, included offenses, defenses, or other facts necessary to an informed decision to waive the right to counsel. Nor did they enter findings as to these issues. The record does not establish that Imus' choice was "made with eyes open." *Faretta v. California, supra* at 835, quoting from *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 87 L. Ed. 268, 63 S. Ct. 236, 143 A.L.R. 435 (1942).

For these reasons, I would reverse and remand for new trial.

Review denied by Supreme Court May 11, 1984.